JUDGE NATHAN

K&L GATES, LLP
Attorneys for Plaintiff
599 Lexington Avenue
New York, New York 10022
Tel: (212) 536-3900
Fax: (212) 536-3901
George K. Kontakis (GK-0484)

15 CV 01806

RECEIVED
MAR 1 1 2015
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

RANGER OFFSHORE MEXICO, S. DE
R.L. DE C.V.,

                      Plaintiff,

      v.

GRUPO TRADECO, S.A. DE C.V.,
TRADECO INFRAESTRUCTURA, S.A.
DE C.V.

               Defendants,

------------------------------------------------------------X

15 CV _____

**VERIFIED COMPLIANT**

      Plaintiff RANGER OFFSHORE MEXICO, S. DE R.L. DE C.V., (hereinafter "RANGER") by its attorneys, K&L GATES, LLP, as and for its Verified Complaint against the Defendants, GRUPO TRADECO, S.A. DE C.V. (hereinafter "GRUPO TRADECO") and TRADECO INFRAESTRUCTURA, S.A. DE C.V. (hereinafter "TRADECO"), alleges upon information and belief as follows:

<u>JURISDICTION</u>

    1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure, and also falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333.

    2.    The Court also has jurisdiction pursuant to 9 U.S.C. § 1, *et seq.* and 9 U.S.C. § 201, *et seq.*

## THE PARTIES

3.     Plaintiff RANGER OFFSHORE MEXICO, S. DE R.I. DE C.V. ("RANGER") is a Mexican corporation with its principal place of business in Ciudad del Carmen, Mexico.

4.     Defendant GRUPO TRADECO, S.A. DE C.V. ("GRUPO TRADECO") is a Mexican corporation with its principal place of business in Mexico City, Mexico.

5.     Defendant TRADECO INFRAESTRUCTURA, S.A. DE C.V. ("TRADECO") is a Mexican corporation with its principal place of business in Mexico City, Mexico. It sometimes does business as TRADECO INFRAESTRUCTURA, INC.

## FACTS

6.     RANGER and TRADECO entered into a BIMCO Time Charter Party for Offshore Service Vessels for the charter of the *M/V Lewek Toucan* on January 31, 2014 (the "Charter Party Agreement"). A true and correct copy of the Charter Party Agreement is attached as Exhibit "A."

7.     Under the Charter Party Agreement, TRADECO chartered from RANGER the *M/V Lewek Toucan* (the "Vessel").

8.     The hire period was for one hundred twenty (120) days, with delivery in Ingleside, Texas.

9.     The charter hire is US$98,000 per day, excluding value-added tax.

10.    RANGER and GRUPO TRADECO entered into a BIMCO Charter Party Guarantee on May 27, 2014 (the "Guarantee"). A true and correct copy of the Guarantee is attached hereto as Exhibit "B."

11.     RANGER and TRADECO executed Amendment No. 1 to the Charter Party Agreement on June 13, 2014 (the "Amendment").   A true and correct copy of the Amendment is attached hereto as Exhibit "C."

12.     The Amendment memorialized the parties' agreement related to the temporary suspension of the charter that began on April 15, 2014.

13.     The Amendment also acknowledged an outstanding balance under the Charter Party Agreement as totaling US$5,948,558.15 for the period of the charter leading up to the temporary suspension that began on April 15, 2014.

14.     The Amendment further provided that the Vessel would return from the temporary suspension between August 10, 2014 and September 7, 2014.

15.     The suspension ended on August 14, 2015.

16.     Under the Charter Party Agreement, as amended, the charter was to end on December 25, 2014.

17.     The total sum of US$19,958,319.04 in outstanding charter hire and related expenses is due and owning RANGER.

18.     The Charter Party Agreement, and the Guarantee of the Charter Party Agreement, are maritime contracts (hereinafter the "maritime contracts").

<u>AS FOR A CAUSE OF ACTION FOR<br>BREACH OF THE MARITIME CONTRACTS</u>

19.     Pursuant to the terms and conditions of the Charter Party Agreement, TRADECO agreed to make regular payments to RANGER for charter hire and related expenses.

20.     RANGER and TRADECO also agreed that any disputes arising under the Charter Party Agreement would be submitted to arbitration in Houston, Texas and would be subject to U.S. Maritime Law.

21.     In addition to the charter hire, the parties agreed that TRADECO would reimburse or pay other enumerated costs expected to be incurred in connection with the charter.

22.     The charter period began at Noon on Sunday, February 3, 2014.

23.     RANGER timely delivered the Vessel.

24.     TRADECO accepted delivery of the Vessel without taking exception.

25.     TRADECO continually failed to timely pay RANGER for hire and other payments due for the charter of the Vessel.

26.     TRADECO owes RANGER US$19,958,319.04 in outstanding charter hire and related expenses.

27.     GRUPO TRADECO guaranteed the January 31, 2014 Charter Party and is now in default of the Guarantee.

28.     RANGER and GRUPO TRADECO also agreed that any disputes arising under the Guarantee would be submitted to a court of competent jurisdiction in Houston, Texas.

29.     TRADECO and GRUPO TRADECO breached the maritime contracts.

30.     TRADECO and GRUPO TRADECO are both liable to RANGER for the principal debt of US$19,958,319.04 under the maritime contracts.

## RELATED PROCEEDINGS

31.     RANGER initiated arbitration against TRADECO in Houston, Texas with the Houston Maritime Arbitrators Association as required by the Charter Party Agreement.

32.     RANGER initiated litigation against GRUPO TRADECO in Houston, Texas in the U.S. District Court for the Southern District of Texas as required by the Guarantee.

## AWARD

33.     The allowable award for RANGER's principal claim against the defendants is:

**Principal claim**                     **US$19,958,319.04**

## PRAYER FOR RELIEF

34.     Notwithstanding the fact that the liability of the Defendants is subject to a determination by a U.S. District Court for the Southern District of Texas and a Houston, Texas arbitration panel, there are now, or will be during the pendency of this action, certain assets, accounts, freights, hire payments, monies, charter hire, credits, effects, funds, payments for bunkers, goods or services, bills of lading, cargo, debts and the like belonging to or claimed by the Defendants within this District and held by various parties, as garnishees.

35.     Plaintiff believes that some of these assets, in bank accounts, are located in this District in the possession of garnishees Banco Espirito Santo, S.A., Banco Espirito Santo de Investimento, S.A. (BESI) and Novo Banco, S.A., and possibly other banks or financial institutions located in New York.

36.     As supported by the accompanying declaration of Attorney George K. Kontakis, the Defendants cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

37.     Because this Verified Complaint sets forth an in personam maritime claim against the Defendants and because the Defendants cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, the requirements for a Rule B attachment and garnishment are met and Plaintiff seeks the issuance of process of maritime attachment so that it may obtain security for its claims against the Defendants and/or quasi in rem jurisdiction over the property of the Defendants so that an eventual judgment and/or award can be satisfied.

WHEREFORE, Plaintiff prays as follows:

A.     That the Defendants be summoned to appear and answer this Verified Complaint;

B.     That the Defendants not being found within this District, as supported by the Declaration of George K. Kontakis, then all of its assets, accounts, freights, monies, charter hire, credits, effects, funds, payment for bunkers, goods or services, bills of lading, cargo and the like belonging to or claimed by the Defendants within this District up to the amount sued for herein be attached pursuant to Supplemental Rule B and to pay Plaintiff's damages; and,

D.     That Plaintiff has such other and further relief as the Court may determine to be just and proper under the circumstances.

Dated: New York, New York
March 11, 2015

K&L GATES, LLP
Attorneys for Plaintiff

By:

George K. Kontakis (GK 0484)
599 Lexington Avenue
New York, New York 10022
Tel: (212) 536-3900
Fax: (212) 536-3901
Email: george.kontakis@klgates.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

RANGER OFFSHORE MEXICO, S. DE
R.L. DE C.V.,

                        Plaintiff,

         v.

GRUPO TRADECO, S.A. DE C.V.,
TRADECO INFRAESTRUCTURA, S.A.
DE C.V.

                      Defendants,

------------------------------------------------------------X

15 CV _____

**VERIFICATION OF
COMPLAINT**

Pursuant to 28 U.S.C. §1746, JAMES P. LAM, declares under penalty of perjury:

1.     I have been the General Counsel of Ranger Offshore, Inc. since 2011.

2.     In my role as General Counsel, I also oversee legal matters related to Ranger Offshore, Inc.'s fully-owned subsidiary Ranger Offshore Mexico, S. de R.L. de C.V. ("*Ranger*"), the Plaintiff in this matter.

3.     I have read the foregoing Verified Complaint and know the contents thereof.

4.     The matters contained therein are true and correct based on documents and information obtained from employees and representatives of Ranger.

I declare under penalty of perjury that the foregoing is true and correct.

JAMES P. LAM

Place Executed:     Houston, TX

Date Executed:     March 11, 2015

# Exhibit A

First issued 1975
Revised 1989 and 2005.

Printed by BIMCO's idea

Adopted by
International Support Vessel Owners'
Association (ISOA), London

Copyright published by
BIMCO, Copenhagen

**BIMCO**

TIME CHARTER PARTY FOR OFFSHORE SERVICE VESSELS
CODE NAME: SUPPLYTIME 2005:
PART I

| | |
|---|---|
| 1. Place and date of contract<br>Houston, TX, January 31, 2014 | |

| | |
|---|---|
| 2. Owners/Place of business (full style, address, e-mail and fax no.)<br>Ranger Offshore Mexico, S. de.R.L. de C.V.G.<br>Ave. Echa 49A Parque Ind. Mundo Maya<br>Cuidad del Carmen, Campeche C.P. 24153, Mexico<br>Tel. 52 938 131 4707<br>Lcunningham@rangeroffshoreinc.com<br>RFC ROM1206196H9 | 3. Charterers/Place of business (full style, address, e-mail and fax no.):<br>Trafeco Infraestructura, B.A. de C.Y.<br>Insurgentes Sur 1647 Local D<br>Col. San Jose Insurgentes<br>Delegacion Benito Juarez<br>Mexico, Distrito Federal, C.P. 03900<br>Tel. (55)2282300<br>Email: jose.v.elazquez@torcaney.com<br>RFC TIN020218SU9 |

| 4. Vessel's name and IMO number (ANNEX A)<br>MV Lewek Toucan<br>IMO number 9374284 | 5. Date of delivery (Cl. 2(a) and (c)):<br>January 31, 2014 | 6. Cancelling date (Cl. 2(a) and (c)):<br>February 20, 2014 |
|---|---|---|

| | |
|---|---|
| 7. Port or Place of delivery (Cl. 2(a))<br>Safe Berth, Ingleside, Texas | 8. Port or place redelivery/notice of redelivery (Cl. 2(d))<br>(i) Port or place of redelivery<br>Port of Galveston, Texas, at safe berth Owner's option or other mutually agreed<br>US GOM Port<br><br>(ii) Number of days' notice of redelivery.<br>Thirty (30) days. |

| 9. Period of hire (Cl. 1(a))<br>One hundred twenty (120) days | 10. Extension of period of hire (optional) (Cl. 1(b)):<br>(i) Period of extension<br>1 x 30 day option at Charterer's option<br>2 x 30 day options to be mutually agreed<br><br>(ii) Advance notice for declaration of option (days)<br>45 days |
|---|---|

| 11. Automatic extension period to complete voyage or well (Cl. 1(c))<br>(i) Voyage or well (state which)<br>Voyage:<br><br>(ii) Maximum extension period (state number of days)<br>Five (5) days | 12. Mobilisation charge (Cl. 2(b)(ii)):<br>(i) Lump sum<br>None;<br><br>(ii) When due<br>N/A |
|---|---|

| 13. Early termination of charter (state amount of hire payable) (Cl. 31(a))<br>(i) State yes, if applicable<br>N/A<br><br>(ii) If yes, state amount of hire payable:<br>N/A | 14. Number of days' notice of early termination (Cl. 31(a))<br>N/A | 15. Demobilisation charge (lump sum) (Cl. 2(a) and Cl. 31 (a))<br>N/A |
|---|---|---|

| 16. Area of operation (Cl. 6(a))<br>Gulf Of Mexico. | 17. Employment of vessel restricted to (state nature of services(s)) (Cl. 6(a))<br>Offshore construction and Subsea operations including diving and any other associated duties as directed by Charters but in any event always within Vessel's design criteria for safe operating conditions and Class approved certificates. |
|---|---|

| 18. Specialist operations (Cl. 6(a))<br>(i) State if vessel may be used for ROV operations:<br>Yes<br><br>(ii) State if vessel may be employed as a diving platform<br>Yes | 19. Bunkers (Cl. 10)<br>(i) Quantity of bunkers on delivery and redelivery<br>To be determined by on hire/off hire survey, however, Owners agree to deliver the Vessel with enough fuel for the transit to Carmen, Mexico.<br><br>(ii) Price of bunkers on delivery<br>N/A<br><br>(iii) Price for bunkers on redelivery<br>Any shortage in fuel on redelivery shall be reimbursed to Owner by Charterer at the then prevailing market rate. Any overages in fuel will be refunded by Owner to Charterer at the then prevailing market rate.<br><br>(iv) Fuel specifications and grades for fuel supplied by Charterers<br>To be provided by Owner prior to delivery |
|---|---|

| 20. Charter hire (state rate and currency) (Cl. 12(a)), (d) and (c)<br>USD 85,000 per day, pro rata. Rate excludes survey. Rate excludes VAT. VAT and 6% of all invoices of Owners to be paid in eMexican Pesos converted from US Dollars on the date payment is made. | 21. Extension hire (if agreed, state rate) (Cl. 12(b))<br>USD 85,000 per day, pro rata. If Vessel is performing sat. diving related services during extension period, rate is USD 95,000 per day, pro rata. |
|---|---|

continued

| 22. Invoicing for hire and other payments (Cl.12(d)). (i) State whether to be issued in advance or arrears, Advance, but see additional clause 46. (ii) State by whom to be issued if other than the party stated in Box 2. Box 2 (iii) State to whom to be issued if address other than stated in Box 3. Box 3 | 23. Payment's (state mode and place of payment; also state beneficiary and bank account) (Cl.12(e)) As per Owners Invoice Instructions | |
|---|---|---|
| 24. Payment of hire, bunker invoices and disbursements for Charterers' account (state maximum number of days) (Cl.12(e)) See additional clause 46. | 25. Interest rate payable (Cl.12(g)) 8% APR | 26. Maximum audit period (Cl.12(h)) One (1) year |
| 27. Meals (state rate agreed) (Cl.6(c)(ii)) Provided by Charterers, see Clause 50. | 28. Accommodation (state rate agreed) (Cl.6(c)(ii)) See Clause 50. | 29. Sublet (state amount of daily increment of charter hire) (Cl.20) None $0.00 |
| 30. War Cancellation (indicate countries agreed) (Cl.23) Sub-clause (a) of clause 23 applies. | | |
| 31. General Average (Place of settlement – only to be filled in if other than London) (Cl.26) Houston, Texas | | |
| 32. Taxes (Payable by Owners) (Cl.30) Each party will pay taxes due on its own profits, property, and personnel | | |
| 33. Breakdown (State period) (Cl.31(b)(v)) Twelve (12) days | | |
| 34. Dispute resolution (state (a), (b) or (c) of Cl. 34, as agreed; if (c) agreed also state Place of Arbitration) (Cl.34) Arbitration in Houston under US general maritime law-see additional clause 39 | | |
| 35. Numbers of additional clauses covering special provisions, if agreed: 39 - 51 | | |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in the Charter consisting of PART I, including additional clauses, if any agreed and stated in Box 35, as well as PART II as well as ANNEX "A" and ANNEX "B" as annexed to this Charter. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II and ANNEX "A" and ANNEX "B" to the extent of such conflict but no further.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| | |

# SUPPLYTIME 2005 Time Charter Party for Offshore Service Vessels

**Definitions**

"Owners" shall mean the party stated in Box 2 — 1
"Charterers" shall mean the party stated in Box 3 — 2
"Vessel" shall mean the Vessel named in Box 4 and — 3
with particulars stated in ANNEX "A". — 4
"Well" shall mean the Vessel required to drill, test, — 5
complete and/or abandon a single borehole including — 6
any side-track thereof. — 7
"Offshore Unit" shall mean any vessel, offshore — 8
installation, structure and/or mobile unit used in offshore — 9
exploration, construction, pipe-laying or repair, — 10
exploitation or production. — 11
"Employees" shall mean employees, directors, — 12
officers, servants, agents or invitees. — 13
— 14

**1.   Charter Period**
   (a)    The Owners let and the Charterers hire the Vessel — 15
   for the period as stated in Box 9 from the time the Vessel — 16
   is delivered to the Charterers. — 17
   (b)    Subject to Clause 12(b), the Charterers have the — 18
   option to extend the Charter Period in direct continuation — 19
   for the period stated in Box 10(i), but such an option — 20
   must be declared in accordance with Box 10(ii). — 21
   (c)    The Charter Period shall automatically be — 22
   extended for the time required to complete the voyage — 23
   or well (whichever is stated in Box 11(i)) in progress, — 24
   such time not to exceed the period stated in Box 11(ii). — 25
— 26

**2.   Delivery and Redelivery**
   (a).   Delivery. - Subject to Clause 2(b) the Vessel shall — 27
   be delivered by the Owners free of cargo and with clean — 28
   tanks at any time between the date stated in Box 5 and — 29
   the date stated in Box 6 at the port or place stated in — 30
   Box 7 where the Vessel can safely lie always afloat. — 31
   (b)    Mobilisation. -- — 32
   (i)    The Charterers shall pay a lump sum mobilisation — 33
   charge as stated in Box 12 without discount. — 34
   (ii)   Should the Owners agree to the Vessel loading — 35
   and transporting cargo and/or undertaking any — 36
   other service for the Charterers en route to the — 37
   port of delivery or from this port of redelivery, then — 38
   all terms and conditions of this Charter Party shall — 39
   apply to such loading and transporting and/or — 40
   other service exactly as if performed during the — 41
   Charter Period excepting only that any lump sum — 42
   freight agreed in respect thereof shall be payable — 43
   and earned on shipment or commencement of — 44
   the service as the case may be, the Vessel and/ — 45
   or goods lost or not lost. — 46
— 47
   (c)    Cancelling. - If the Vessel is not delivered by — 48
   midnight local time on the cancelling date stated in Box — 49
   5, the Charterers shall be entitled to cancel this Charter — 50
   Party. However, if the Owners will be unable to deliver — 51
   the Vessel by the cancelling date, they may give notice — 52
   in writing to the Charterers at any time prior to the delivery — 53
   date as stated in Box 5 and shall state in such notice the — 54
   date by which they will be able to deliver the Vessel. The — 55
   Charterers may within 24 hours of receipt of such notice — 56
   give notice in writing to the Owners cancelling this Charter — 57
   Party. If the Charterers do not give such notice, then the — 58
   later date specified in the Owners' notice shall be — 59
   substituted for the cancelling date for all the purposes of — 60
   this Charter Party. In the event the Charterers cancel — 61
   the Charter Party, it shall terminate on terms that neither — 62
   party shall be liable to the other for any losses incurred — 63
   by reason of the non-delivery of the Vessel or the — 64
   cancellation of the Charter Party. — 65
   (d)    Redelivery. - The Vessel shall be redelivered on — 66
   the expiration or earlier termination of this Charter Party — 67

free of cargo and with clean tanks at the port or place — 68
as stated in Box 8(i) or such other port or place as may — 69
be mutually agreed. The Charterers shall give not less — 70
then the number of days notice in writing of their intention — 71
to redeliver the Vessel, as stated in Box 8(ii). — 72
   (e)    Demobilisation. - The Charterers shall pay a lump — 73
   sum demobilisation charge without discount in the amount — 74
   as stated in Box 15 which amount shall be paid on the — 75
   expiration or on earlier termination of this Charter Party. — 76

**3.   Condition of Vessel**
   (a)    The Owners undertake that at the date of delivery — 77
   under this Charter Party the Vessel shall be of the — 78
   description and Class as specified in ANNEX "A", — 79
   attached hereto, and in a thoroughly efficient state of — 80
   hull and machinery. — 81
   (b)    The Owners shall exercise due diligence to — 82
   maintain the Vessel in such Class and in every way fit — 83
   for the service stated in Clause 6 throughout the period — 84
   of this Charter Party. — 85
— 86

**4.   Structural Alterations and Additional Equipment**
   The Charterers shall, at their expense, have the option — 87
   of making structural alterations to the Vessel or installing — 88
   additional equipment with the written consent of the — 89
   Owners, which shall not be unreasonably withheld. — 90
   Unless otherwise agreed, the Vessel is to be redelivered, — 91
   reinstated, at the Charterers' expense, to her original — 92
   condition. The Vessel is to remain on hire during any — 93
   period of these alterations or reinstatement. The — 94
   Charterers shall at all times be responsible for repair — 95
   and maintenance of any such alteration or additional — 96
   equipment. However, the Owners may, upon giving — 97
   notice, undertake any such repair and maintenance at — 98
   the Charterers' expense, when necessary for the safe — 99
   and efficient performance of the Vessel. — 100
— 101

**5.   Survey**
   The Owners and the Charterers shall jointly appoint an — 102
   independent surveyor for the purpose of determining — 103
   and agreeing in writing, the condition of the Vessel, any — 104
   anchor handling and towing equipment specified in — 105
   ANNEX "A", and the quality and quantity of fuel, — 106
   lubricants and water at the time of delivery and redelivery — 107
   hereunder. The Owners and the Charterers shall jointly — 108
   share the time and expense of such surveys. — 109
— 110

**6.   Employment and Area of Operation**
   (a)    The Vessel shall be employed in offshore activities — 111
   which are lawful in accordance with the law of the place — 112
   of the Vessel's flag and/or registration and of the place — 113
   of operation. Such activities shall be restricted to the — 114
   service(s) as stated in Box 17, and to voyages between — 115
   any good and safe port or place and any place or — 116
   offshore unit where the Vessel can safely lie always — 117
   afloat within the Area of Operation as stated in Box 16 — 118
   which shall always be within International Navigation — 119
   Limits and which shall in no circumstances be exceeded — 120
   without prior agreement and adjustment of the Hire and — 121
   in accordance with such other terms as appropriate to — 122
   be agreed, provided always that the Charterers do not — 123
   warrant the safety of any such port or place or offshore — 124
   unit but shall exercise due diligence in issuing their — 125
   orders to the Vessel as if the Vessel were their own — 126
   property and having regard to her capabilities and the — 127
   nature of her employment. — 128
   Unless otherwise stated in Box 18(i), the Charterers — 129
   shall not have the right to use the Vessel for ROV — 130
   operations. Unless otherwise stated in Box 18(ii), the — 131
   Vessel shall not be employed as a diving platform. — 132
— 133

This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. In event of any modification being made to the result of discrepancies between the original BIMCO approved document and this computer generated document. BIMCO assumes no responsibility for any loss, damage or expense caused as a

(b)    Relevant permission and licences from responsible authorities for the Vessel to enter, work in and leave the Area of Operation shall be obtained by the Charterers and the Owners shall assist, if necessary, in every way possible to secure such permission and licences.

(c)    The Vessel's Space - The whole reach and burden and decks of the Vessel shall throughout this Charter Period be at the Charterers' disposal reserving proper and sufficient space for the Vessel's Master, Officers, Crew, tackle, apparel, furniture, provisions and stores. The Charterers shall be entitled to carry, so far as space is available and for their purposes in connection with their operations:

(i)    Persons other than crew members, other than fare paying, and for such purposes to make use of the Vessel's available accommodation not being used on the voyage by the Vessel's Crew. The Owners shall provide suitable provisions and requisites for such persons for which the Charterers shall pay at the rate as stated in Box 27 per meal and at the rate as stated in Box 28 per day for the provision of bedding and services for persons using berth accommodation;

(ii)    Lawful cargo whether carried on or under deck.

(iii)    Explosives and dangerous cargo whether in bulk or packaged, provided proper notification has been given and such cargo is marked and packed in accordance with the national regulations of the Vessel and/or the International Maritime Dangerous Goods Code and/or other pertinent regulations. Failing such proper notification, marking or packing the Charterers shall indemnify the Owners in respect of any loss, damage or liability, whatsoever and howsoever arising therefrom. The Charterers accept responsibility for any additional expenses (including reinstatement expenses) incurred by the Owners in relation to the carriage of explosives and dangerous cargo.

(iv)    Hazardous or noxious substances, subject to Clause 14(f), proper notification and any pertinent regulations.

(d)    Laying-up of Vessel - The Charterers shall have the option of laying-up the Vessel at an agreed safe port or place for all or any portion of the Charter Period in which case the Hire hereunder shall continue to be paid but, if the period of such lay-up exceeds 30 consecutive days, there shall be credited against such Hire the amount which the Owners shall reasonably have saved by way of reduction in expenses and overheads as a result of the lay-up of the Vessel.

7.    Master and Crew:
(a)    (i) The Master shall carry out his duties promptly and the Vessel shall render all reasonable services within her capabilities by day and by night and at such times and on such schedules as the Charterers may reasonably require without any obligations of the Owners or to pay to the Owners or the Master, Officers or the Crew of the Vessel any excess or overtime payments. The Charterers shall furnish the Master with all instructions and sailing directions and the Master and Engineer shall keep full and correct logs accessible to the Charterers or their agents.

(ii)(1) No Bills of Lading shall be issued for shipments under this Charter Party.

(2) The Master shall sign cargo documents as directed by the Charterers in the form of receipts

that are non-negotiable documents and which are clearly marked as such.

(3) The Charterers shall indemnify the Owners against all liabilities that may arise from the signing of such cargo documents in accordance with the directions of the Charterers to the extent that the terms of such cargo documents impose more onerous liabilities than those assumed by the Owners under the terms of this Charter Party.

(b)    The Vessel's Crew if required by Charterers will connect and disconnect electric cables, fuel, water and pneumatic hoses when placed on board the Vessel in port as well as alongside the offshore units; will operate the machinery on board the Vessel for loading and unloading cargoes; and will hook and unhook cargo on board the Vessel when loading or discharging alongside offshore units. If the port regulations or the seamen and/or labour unions do not permit the Crew of the Vessel to carry out any of this work, then the Charterers shall make, at their own expense, whatever other arrangements may be necessary, always under the direction of the Master.

(c)    If the Charterers have reason to be dissatisfied with the conduct of the Master or any Officer or member of the Crew, the Owners on receiving particulars of the complaint shall promptly investigate the matter and if the complaint proves to be well founded, the Owners shall as soon as reasonably possible make appropriate changes in the appointment.

(d)    The entire operation, navigation, and management of the Vessel shall be in the exclusive control and command of the Owners, their Master, Officers and Crew. The Vessel shall be operated and the services hereunder will be rendered as requested by the Charterers, subject always to the exclusive right of the Owners or the Master of the Vessel to determine whether operation of the Vessel may be safely undertaken. In the performance of the Charter Party, the Owners are deemed to be an independent contractor, the Charterers being concerned only with the results of the services performed.

8.    Owners to Provide:
(a)    The Owners shall provide and pay for all provisions, wages and all other expenses of the Master, Officers and Crew; all maintenance and repair of the Vessel's hull, machinery and equipment as specified in ANNEX "A"; also, except as otherwise provided in this Charter Party, for all insurance on the Vessel, all dues and charges directly related to the Vessel's flag and/or registration, all deck, cabin and engineroom stores, cordage required for ordinary ship's purposes, mooring alongside in harbour, and all fumigation expenses and de-ratisation certificates. The Owners' obligations under this Clause extend to cover all liabilities for consular charges appertaining to the Master, Officers and Crew, customs or import duties arising at any time during the performance of this Charter Party in relation to the personal effects of the Master, Officers and Crew, and in relation to the stores, provisions and other matters as aforesaid which the Owners are to provide and/or pay for and the Owners shall refund to the Charterers any sums they or their agents may have paid or been compelled to pay in respect of such liability.

(b)    On delivery the Vessel shall be equipped, if appropriate, at the Owners' expense with any towing and anchor handling equipment specified in ANNEX "A".

9.    Charterers to Provide:
(a)    While the Vessel is on hire the Charterers shall,

This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

provide and pay for all fuel, lubricants, water, 269
dispersants, firefighting foam and transport thereof, port 270
charges, pilotage and boatmen and canal steersmen 271
(whether compulsory or not), launch hire (unless 272
incurred in connection with the Owners' business), light 273
dues, tug assistance, canal, dock, harbour, tonnage and 274
other dues and charges, agencies and commissions 275
incurred on the Charterers' business, costs for security 276
or other watchmen, and of quarantine (if occasioned 277
by the nature of the cargo carried or the ports visited 278
whilst employed under this Charter Party but not 279
otherwise). 280

(b) At all times the Charterers shall provide and pay 281
for the loading and unloading of cargoes so far as not 282
done by the Vessel's crew, cleaning of cargo tanks, all 283
necessary dunnage, uprights and shoring equipment 284
for securing deck cargo, all cordage except as to be 285
provided by the Owners, all ropes, slings and special 286
runners (including bulk cargo discharge hoses) actually 287
used for loading and discharging, inert gas required for 288
the protection of cargo, and electrodes used for offshore 289
works, and shall reimburse the Owners for the actual 290
cost of replacement of special mooring lines to offshore 291
units, wires, nylon spring lines etc. used for offshore 292
works, all hose connections and adaptors, and further, 293
shall refill oxygen/acetylene bottles used for offshore 294
works. 296

(c) Upon entering into this Charter Party or in any 296
event no later than the time of delivery of the Vessel 297
the Charterers shall provide the Owners with copies of 298
any operational plans or documents which are 299
necessary for the safe and efficient operation of the 300
Vessel. All documents received by the Owners shall be 301
returned to the Charterers on redelivery. 302

(d) The Charterers shall pay for customs duties, all 303
permits, import duties (including costs involved in 304
establishing temporary or permanent importation 305
bonds), and clearance expenses, both for the Vessel 306
and/or equipment, and spares required for, or arising out of, or 307
during hire
Charter Party. See also clauses 41, 42, and 46.

(e) The Charterers shall pay for any replacement of 308
any anchor handling/towing/lifting wires and accessories 309
which have been placed on board by the Owners or the 310
Charterers, should such equipment be lost, damaged or 311
become unserviceable, other than as a result of the 312
Owners' negligence. 313

(f) The Charterers shall pay for any fines, taxes or 314
imposts levied in the event that contraband and/or 315
unmanifested drugs and/or cargoes are found to have 316
been shipped as part of the cargo and/or in containers 317
on board. The Vessel shall remain on hire during any 318
time lost as a result thereof. However, if it is established 319
that the Master, Officers and/or Crew are involved in 320
smuggling then any financial security required shall be 321
provided by the Owners. 322
323

10. Bunkers 324
(a) Quantity at Delivery/Redelivery. – The Vessel shall 325
be delivered with at least the quantity of fuel as stated 326
in Box 19 (i) and the Vessel shall be redelivered with 327
about the same quantity as on delivery, provided always 328
that the quantity of fuels at redelivery is at least sufficient 329
to allow the Vessel to safely reach the nearest port at 330
which fuels of the required type or better are available. 331
(b) Purchase Price. – The Charterers shall purchase 332
the fuels on board at delivery at the price prevailing at 333
the time and port of delivery unless otherwise stated in 334
Box 19 (ii) and the Owners shall purchase the fuels on 335

board at redelivery at the price prevailing at the time 336
and port of redelivery unless otherwise stated in Box 337
19 (iii). The Charterers shall purchase the lubricants 338
on board at delivery at the list price and the Owners 339
shall purchase the lubricants on board at redelivery at 340
the list price. 341
(c) Bunkering. – The Charterers shall supply fuel of the 342
specifications and grades stated in Box 19 (iv). The fuels 343
shall be of a stable and homogeneous nature and unless 344
otherwise agreed in writing, shall comply with ISO 345
standard 8217:1996 of any subsequent amendments 346
thereof as well as with the relevant provisions of 347
MARPOL. The Chief Engineer shall co-operate with the 348
Charterers' bunkering officers and fuel suppliers and 349
comply with their requirements during bunkering, 350
including but not limited to checking, verifying and 351
acknowledging sampling, reading or soundings, meters 352
etc. before, during and/or after delivery of fuels. During 353
delivery four representative samples of all fuels shall be 354
taken at a point as close as possible to the Vessel's 355
bunker manifold. The samples shall be labelled and 356
sealed and signed by suppliers, Chief Engineer and the 357
Charterers or their agents. Two samples shall be retained 358
by the suppliers and one each by the Vessel and the 359
Charterers. If any claim should arise in respect of the 360
quality or specification or grades of the fuels supplied, 361
the samples of the fuels retained as aforesaid shall be 362
analysed by a qualified and independent laboratory. 363
(d) Liability. – The Charterers shall be liable for any 364
loss or damage to the Owners caused by the supply of 365
unsuitable fuels or fuels which do not comply with the 366
specifications and grades set out in Box 19 (iv) and the 367
Owners shall not be held liable for any reduction in the 368
Vessel's speed performance and/or increased bunker 369
consumption nor for any time lost and any other 370
consequence arising as a result of such supply. 371

11. BIMCO ISPS/MTSA Clause for Time Charter Parties 372
(a) (i) The Owners shall comply with the requirements 373
of the International Code for the Security of Ships 374
and of Port Facilities and the relevant amendments 375
to Chapter XI of SOLAS (ISPS Code) relating to 376
the Vessel and "the Company" (as defined by the 377
ISPS Code). If trading to or from the United States 378
or passing through United States waters, the 379
Owners shall also comply with the requirements 380
of the US Maritime Transportation Security Act, 381
2002 (MTSA) relating to the Vessel and the 382
"Owner" (as defined by the MTSA). 383
(ii) Upon request the Owners shall provide a copy of 384
the relevant International Ship Security Certificate 385
(or the Interim International Ship Security 386
Certificate) to the Charterers. The Owners shall 387
provide the Charterers with the full style contact 388
details of the Company Security Officer (CSO). 389
(iii) Except as otherwise provided in this Charter Party, 390
loss, damage, expense or delay (excluding 391
consequential loss, damage, expense or delay) 392
caused by failure on the part of the Owners or 393
"the Company"/"Owner" to comply with the 394
requirements of the ISPS Code/MTSA or this 395
Clause shall be for the Owners' account. 396
(b) (i) The Charterers shall provide the Owners and 397
the Master with their full style contact details and, 398
upon request, any other information the Owners 399
require to comply with the ISPS Code/MTSA. 400
Furthermore, the Charterers shall ensure that all 401
sub-charter parties they enter into during the 402
period of this Charter Party contain the following 403

This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

provision;                                                                     404
"The Charterers shall provide the Owners with                                  405
their full style contact details and, where sub-                               406
letting is permitted under the terms of this charter                           407
party, shall ensure that the contact details of all                            408
sub-charterers are likewise provided to the                                    409
Owners".                                                                       410

(ii)    Except as otherwise provided in this Charter Party,                     411
loss, damage, expense or delay (excluding                                      412
consequential loss, damages, expense or delay)                                 413
caused by failure on the part of the Charterers to                             414
comply with this Clause shall be for the Charterers'                           415
account.                                                                       416

(c)    Notwithstanding anything else contained in this                          417
Charter Party all delay, costs or expenses whatsoever                          418
arising out of or related to security regulations or                           419
measures required by the port facility or any relevant                         420
authority in accordance with the ISPS Code/MTSA                                421
including, but not limited to, security guards, launch                          422
services, tug escorts, port security fees or taxes and                         423
inspections, shall be for the Charterers' account, unless                      424
such costs or expenses result solely from the Owners'                          425
negligence. All measures required by the Owners to                             426
comply with the Ship Security Plan shall be for the                            427
Owners' account.                                                               428

(d)    If either party makes any payment which is for the                        429
other party's account according to this Clause, the other                      430
party shall indemnify the paying party.                                        431

12.    Hire and Payments                                                         432
(a)    Hire. - The Charterers shall pay Hire for the Vessel                      433
at the rate stated in Box 20 per day or pro rata for part                       434
thereof from the time that the Vessel is delivered to the                      435
Charterers until the expiration or earlier termination of                      436
this Charter Party.                                                            437

(b)    Extension Hire. - If the option to extend the Charter                     438
Period under Clause 1(b) is exercised, Hire for such                           439
extension shall, unless stated in Box 21, be agreed                            440
between the Owners and the Charterers. Should the                              441
parties fail to reach an agreement, then the Charterers'                        442
shall not have the option to extend the Charter Period.                        443

(c)    Adjustment of Hire. - The rate of Hire shall be                           444
adjusted to reflect documented changes, after the date                         445
of entering into the Charter Party or the date of                              446
commencement of employment, whichever is earlier,                             447
in the Owners' costs arising from changes in the                              448
Charterers' requirements, or regulations governing the                        449
Vessel and/or its Crew or the Charter Party or the                            450
application thereof.                                                           451

(d)    Invoicing. - All invoices shall be issued in the                          452
contract currency stated in Box 20. In respect of                             453
reimbursable expenses incurred in currencies other than                       454
the contract currency, the rate of exchange into the                          455
contract currency shall be that quoted by the Central                          456
Bank of the country of such other currency as at the                          457
date of the Owners' invoice. Invoices covering Hire and                       458
any other payments due shall be issued monthly as                             459
stated in Box 22(i) or at the expiration or earlier                            460
termination of this Charter Party. Notwithstanding the                        461
foregoing, bunkers and lubricants on board at delivery                        462
shall be invoiced at the time of delivery.                                     463

(e)    Payment s. - Payments of Hire, bunker invoices                           464
and disbursements for the Charterers' account shall be                        465
received within the number of days stated in Box 24                           466
from the date of receipt of the invoice. Payment shall                        467
be made in the currency stated in Box 20 in full without                      468
discount to the account stated in Box 23.                                      469
However, any advances for disbursements made on                               470
behalf of and approved by the Owners may be deducted                          471

from Hire due.                                                                  472
If payment is not received by the Owners within 5                              473
banking days following the due date the Owners are                            474
entitled to charge interest at the rate stated in Box 25                        475
on the amount outstanding from and including the due                          476
date until payment is received.                                                477
Where an invoice is disputed, the Charterers shall notify                      478
the Owners before the due date and in any event pay                           479
the undisputed portion of the invoice but shall be entitled                     480
to withhold payment of the disputed portion provided                          481
that such portion is reasonably disputed and the                              482
Charterers specify such reason. Interest will be                              483
chargeable at the rate stated in Box 26 on such disputed                       484
amounts where resolved in favour of the Owners.                               485
Should the Owners prove the validity of the disputed                          486
portion of the invoice, balance payment shall be received                      487
by the Owners within 5 banking days after the dispute                         488
is resolved. Should the Charterers' claim be valid, a                          489
corrected invoice shall be issued by the Owners.                              490

(f)    (i) Where there is a failure to pay Hire by the due                       491
date, the Owners shall notify the Charterers in                               492
writing of such failure and further may also suspend                          493
the performance of any or all of their obligations                            494
under this Charter Party until such time as all the                           495
Hire due to the Owners under the Charter Party                                496
has been received by the Owners. Throughout any                               497
period of suspended performance under this                                    498
Clause, the Vessel is to be and shall remain on                              499
Hire. The Owners' right to suspend  performance                              500
under this Clause shall be without prejudice to any                           501
other rights they may have under this Charter Party,                          502

(ii)    If after 5 days of the written notification referred                     503
to in Clause 12(f)(i) the Hire has still not been                             504
received the Owners may at any time while Hire                               505
remains outstanding withdraw the Vessel from the                             506
Charter Party. The right to withdraw is to be                                507
exercised promptly and in writing and is not                                 508
dependent upon the Owners first exercising the                               509
right to suspend performance of their obligations                            510
under the Charter Party pursuant to Clause 12(f)(i)                           511
above. The receipt by the Owners of a payment                               512
from the Charterers after the five day period                                513
referred to above has expired but prior to the                               514
notice of withdrawal shall not be deemed a waiver                            515
of the Owners' right to cancel this Charter Party,                            516

(iii)   Where the Owners choose not to exercise any of                          517
the rights afforded to them by this Clause in                                518
respect of any particular late payment of Hire, or                           519
a series of late payments of Hire, under the                                520
Charter Party, this shall not be construed as a                             521
waiver of their right either to suspend performance                           522
under Clause 12(f)(i) or to withdraw the Vessel                              523
from the Charter Party under Clause 12(f)(ii) in                             524
respect of any subsequent late payment under                                525
this Charter Party.                                                          526

(iv)    The Charterers shall indemnify the Owners in                            527
respect of any liabilities incurred by the Owners                            528
under the Bill of Lading or any other contract of                           529
carriage as a consequence of the Owners' proper                             530
suspension of and/or withdrawal from any or all                             531
of their obligations under this Charter Party.                               532

(g)    Audit. - The Charterers shall have the right to                           533
appoint an independent chartered accountant to audit                          534
the Owners' books directly related to work performed                          535
under this Charter Party at any time after the conclusion                      536
of the Charter Party, up to the expiry of the period stated                     537
in Box 26, to determine the validity of the Owners'                           538
charges hereunder. The Owners undertake to make                              539

This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the
pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a
result of discrepancies between the original BIMCO approved document and this computer generated document.

## SUPPLYTIME 2005 Time Charter Party for Offshore Service Vessels

their records available for such purposes at their principal place of business during normal working hours. 640
Any discrepancies discovered in payments made shall 641
be promptly resolved by invoice or credit as appropriate. 642
643

**13. Suspension of Hire** 644
(a) If as a result of any deficiency of Crew or of the 645
Owners' stores, strike of Master, Officers and Crew, 646
breakdown of machinery, damage to hull or other 547
accidents to the Vessel, the Vessel is prevented from 548
working, no Hire shall be payable in respect of any time 549
lost and any Hire paid in advance shall be adjusted 550
accordingly provided always however that Hire shall 551
not cease in the event of the Vessel being prevented 552
from working as aforesaid as a result of: 553
(i) the carriage of cargo as noted in Clause 6(c)(iii) 554
and (iv); 555
(ii) quarantine or risk of quarantine unless caused by 556
the Master, Officers or Crew having communication 557
with the shore at any infected area not in 558
connection with the employment of the Vessel 559
without the consent or the instructions of the 560
Charterers; 561
(iii) deviation from Charter Party duties or 562
exposure to abnormal risks at the request of the 563
Charterers; 564
(iv) detention in consequence of being driven into port 565
or to anchorage through stress of weather or 566
trading to shallow harbours or to river or ports 567
with bars or suffering an accident to her cargo, 568
when the expenses resulting from such detention 569
shall be for the Charterers' account howsoever 570
incurred; 571
(v) detention or damage by ice; 572
(vi) any act or omission of the Charterers, their 573
servants or agents. 574
(b) Liability for Vessel not Working. – The Owners' 575
liability for any loss, damage or delay sustained by the 576
Charterers as a result of the Vessel being prevented 577
from working by any cause whatsoever shall be limited 578
to suspension of hire, except as provided in Clause 579
11(a)(iii). 580
(c) Maintenance and Drydocking. – Notwithstanding 581
Clause 13(a), the Charterers shall grant the Owners a 582
maximum of 7224 hours on hire, of which 24 hours shall be 583
cumulative, per month or pro rata for part of a month 584
from the commencement of the Charter Period for 585
maintenance and repairs including drydocking 586
(hereinafter referred to as "maintenance allowance"). 587
The Vessel shall be drydocked at regular intervals. The 588
Charterers shall place the Vessel at the Owners' 589
disposal clean of cargo, at a port (to be nominated by 590
the Owners at a later date) having facilities suitable to 591
the Owners for the purpose of such drydocking. 592
During reasonable voyage time taken in transits 593
between such port and Area of Operation the Vessel 594
shall be on hire and such time shall not be counted 595
against the accumulated maintenance allowance. 596
Hire shall be suspended during any time taken in 597
maintenance repairs and drydocking in excess of the 598
accumulated maintenance allowance. 599
In the event of less time being taken by the Owners for 600
repairs and drydocking or, alternatively, the Charterers 601
not making the Vessel available for all or part of this 602
time, the Charterers shall, upon expiration or earlier 603
termination of the Charter Party, pay the equivalent of 604
the daily rate of Hire then prevailing in addition to Hire 605
otherwise due under this Charter Party in respect of all 606
such time not so taken or made available. 607

Upon commencement of the Charter Period, the Owners 608
agree to furnish the Charterers with the Owners' 609
proposed drydocking schedule and the Charterers 610
agree to make every reasonable effort to assist the 611
Owners in adhering to such predetermined drydocking 612
schedule for the Vessel. 613

**14. Liabilities and Indemnities** 614
(a) Definitions 615
For the purpose of this Clause "Owners' Group" shall 616
mean: the Owners, and their contractors and sub- 617
contractors, and Employees of any of the foregoing. 618
For the purpose of this Clause "Charterers' Group" shall 619
mean: the Charterers, and their contractors, sub- 620
contractors, co-venturers and customers (having a 621
contractual relationship with the Charterers; always with 622
respect to the job or project on which the Vessel is 623
employed), and Employees of any of the foregoing. 624
(b) Knock for Knock 625
(i) Owners - Notwithstanding anything else contained 626
in this Charter Party excepting Clauses 8(c)(ii), 627
9(b), 9(c), 9(f), 10(d), 11, 12(f)(iv), 14 (d), 15 (b), 628
18(c), 26 and 27, the Charterers shall not be 629
responsible for loss of or damage to the property 630
of any member of the Owners' Group, including 631
the Vessel, or for personal injury or death of any 632
member of the Owners' Group arising out of or in 633
any way connected with the performance of this 634
Charter Party; even if such loss, damage, injury or 635
death is caused wholly or partially by the act, 636
neglect or default of the Charterers' Group, and 637
even if such loss, damage, injury or death is caused 638
wholly or partially by unseaworthiness of any 639
vessel; and the Owners shall indemnify, protect, 640
defend and hold harmless the Charterers from any 641
and against all claims, costs, expenses, actions, 642
proceedings, suits, demands and liabilities 643
whatsoever arising out of or in connection with such 644
loss, damage, personal injury or death. 645
(ii) Charterers - Notwithstanding anything else 646
contained in this Charter Party excepting Clauses 647
11, 15(a), 16 and 26, the Owners shall not be 648
responsible for loss of, damage to, or any liability 649
arising out of anything towed by the Vessel, any 650
cargo laden upon or carried by the Vessel or her 651
tow, the property of any member of the Charterers' 652
Group, whether owned or chartered, including 653
their Offshore Units, or for personal injury or death 654
of any member of the Charterers' Group or of 655
anyone on board anything towed by the Vessel, 656
arising out of or in any way connected with the 657
performance of this Charter Party, even if such 658
loss, damage, liability, injury or death is caused 659
wholly or partially by the act, neglect or default of 660
the Owners' Group, and even if such loss, 661
damage, liability, injury or death is caused wholly 662
or partially by the unseaworthiness of any vessel; 663
and the Charterers shall indemnify, protect, 664
defend and hold harmless the Owners from any 665
and against all claims, costs, expenses, actions, 666
proceedings, suits, demands, and liabilities 667
whatsoever arising out of or in connection with 668
such loss, damage, liability, personal injury or 669
death. 670
(c) Consequential Damages. – 671
Neither party shall be liable to the other for any 672
consequential damages whatsoever arising out of or in 673
connection with the performance or non-performance 674
of this Charter Party, and each party shall protect, defend 675

This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

and indemnify the other from and against all such claims
from any member of its Group as defined in Clause
14(a);
"Consequential damages" shall include, but not be
limited to, loss of use, loss of profits, shut-in or loss of
production and cost of insurance, whether or not
foreseeable at the date of this Charter Party;

(d)  Limitations -
Nothing contained in this Charter Party shall be
construed or held to deprive the Owners or the
Charterers, as against each other, or any person or party, including
as against each other, of any right to claim limitation of
liability provided by any applicable law, statute or
convention, save that nothing in this Charter Party shall
create any right to limit liability. Where the Owners or
the Charterers may seek an indemnity under the
provisions of this Charter Party or against each other in
respect of a claim brought by a third party, the Owners
or the Charterers shall seek to limit their liability against
such third party.

(e)  Himalaya Clause.-
(i)  All exceptions, exemptions, defences, immunities,
limitations of liability, indemnities, privileges and
conditions granted or provided by this Charter Party
or by any applicable statute, rule or regulation for
the benefit of the Charterers shall also apply to
and be for the benefit of the Charterers' parent,
affiliated, related and subsidiary companies; the
Charterers' contractors, sub-contractors, co-
venturers and customers (having a contractual
relationship with the Charterers, always with
respect to the job or project on which the Vessel is
employed); their respective Employees and their
respective underwriters.
(ii)  All exceptions, exemptions, defences, immunities,
limitations of liability, indemnities, privileges and
conditions granted or provided by this Charter Party
or by any applicable statute, rule or regulation for
the benefit of the Owners shall also apply to and
be for the benefit of the Owners' parent, affiliated,
related and subsidiary companies, the Owners'
contractors, sub-contractors, the Vessel, its Master,
Officers and Crew, its registered owner, its operator,
its demise charterer(s), their respective Employees
and their respective underwriters.
(iii)  The Owners or the Charterers shall be deemed
to be acting as agent or trustee of and for the
benefit of all such persons and parties set forth
above, but only for the limited purpose of
contracting for the extension of such benefits to
such persons and parties.

(f)  Hazardous or Noxious Substances.
Notwithstanding any other provision of this Charter Party
to the contrary, the Charterers shall always be
responsible for any losses, damages or liabilities
suffered by the Owners' Group, by the Charterers; or
by third parties, with respect to the Vessel or other
property, personal injury or death, pollution or otherwise,
which losses, damages or liabilities are caused, directly
or indirectly, as a result of the Vessel's carriage of any
hazardous or noxious substances in whatever form as
ordered by the Charterers, and the Charterers shall
defend, indemnify the Owners and hold the Owners
harmless for any expense, loss or liability whatsoever
or howsoever arising with respect to the carriage of
hazardous or noxious substances.

15.  Pollution
(a)  Except as otherwise provided for in Clause 18(c)(iii),

the Owners shall be liable for, and agree to indemnify,
defend and hold harmless the Charterers against all
claims, costs, expenses, actions, proceedings, suits,
demands and liabilities whatsoever arising out of actual
or threatened pollution damage and the cost of cleanup
or control thereof arising from acts or omissions of the
Owners or their personnel which cause or allow
discharge, spills or leaks from the Vessel, except as may
emanate from cargo thereon or therein.
(b)  The Charterers shall be liable for and agree to
indemnify, defend and hold harmless the Owners from
all claims, costs, expenses, actions, proceedings, suits,
demands, liabilities, loss or damage whatsoever arising
out of or arising from any other actual or threatened
pollution damage, even where caused wholly or partially
by the act, neglect or default of the Owners, their
Employees, contractors or sub-contractors or by their
unseaworthiness of the Vessel.
(c)  The Charterers shall, upon giving notice to the
Owners or the Master, have the right (but shall not be
obliged) to place on board the Vessel and/or have in
attendance at the site of any pollution or threatened
incident one or more Charterers' representative to
observe the measures being taken by Owners and/or
national or local authorities or their respective servants,
agents or contractors to prevent or minimise pollution
damage and to provide advice, equipment or manpower
or undertake such other measures, at Charterers' risk
and expense, as are permitted under applicable law
and as Charterers believe are reasonably necessary to
prevent or minimise such pollution damage or to remove
the threat of pollution damage;

16.  Wreck Removal.
If the Vessel becomes a wreck and is an obstruction to
navigation and has to be removed by order of any lawful
authority having jurisdiction over the area where the
Vessel is placed or as a result of compulsory law, the
Owners shall be liable for any and all expenses in
connection with the raising, removal, destruction,
lighting or marking of the Vessel.

17.  Insurance
(a)  (i)  The Owners shall procure and maintain in
effect for the duration of this Charter Party, with
reputable insurers, the insurances set forth in
ANNEX "B".
Policy limits shall not be less than those indicated.
Reasonable deductibles are acceptable and shall
be for the account of the Owners.
(ii)  The Charterers shall upon request be named as
co-insured. The Owners shall upon request cause
insurers to waive subrogation rights against the
Charterers (as encompassed in Clause 14(e)(ii)).
Co-insurance and/or waivers of subrogation shall
be given only insofar as these relate to liabilities
which are properly the responsibility of the Owners
under the terms of this Charter Party.
(b)  The Owners shall upon request furnish the
Charterers with copies of certificates of insurance which
provide sufficient information to verify that the Owners
have complied with the insurance requirements of this
Charter Party.
(c)  If the Owners fail to comply with the aforesaid
insurance requirements, the Charterers may, without
prejudice to any other rights or remedies under this
Charter Party, purchase similar coverage and deduct
the cost thereof from any payment due to the Owners.

676
677
678
679
680
681
682
683
684
685
686
687
688
689
690
691
692
693
694
695
696
697
698
699
700
701
702
703
704
705
706
707
708
709
710
711
712
713
714
715
716
717
718
719
720
721
722
723
724
725
726
727
728
729
730
731
732
733
734
735
736
737
738
739
740
741
742
743

744
745
746
747
748
749
750
751
752
753
754
755
756
757
758
759
760
761
762
763
764
765
766
767
768
769
770
771
772
773
774
775
776
777
778
779
780
781
782
783
784
785
786
787
788
789
790
791
792
793
794
795
796
797
798
799
800
801
802
803
804
805
806
807
808
809

This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

under this Charter Party. | 810

**18.  Saving of Life and Salvage.**

(a)  The Vessel shall be permitted to deviate for the
purpose of saving life at sea without prior approval of
or notice to the Charterers and without loss of Hire
provided however that notice of such deviation is given
as soon as possible. | 811-816

(b)  Subject to the Charterers' consent, which shall not
be unreasonably withheld, the Vessel shall be at liberty
to undertake attempts at salvage, if being understood
that the Vessel shall be off-hire from the time she leaves
port or commences to deviate and she shall remain
off-hire until she is again in every way ready to resume
the Charterers' service at a position which is not less
favourable to the Charterers than the position at the
time of leaving port or deviating for the salvage services.
All salvage monies earned by the Vessel shall be divided
equally between the Owners and the Charterers, after
deducting the Master's, Officers' and Crew's share, legal
expenses, value of fuel and lubricants consumed, Hire
of the Vessel lost by the Owners during the salvage,
repairs to damage sustained, if any, and any other
extraordinary loss or expense sustained as a result of
the salvage.
The Charterers shall be bound by all measures taken
by the Owners in order to secure payment of salvage
and to fix its amount. | 817-837

(c)  The Owners shall waive their right to claim any
award for salvage performed on property owned by or
contracted to the Charterers, always provided such
property was the object of the operation the Vessel was
chartered for, and the Vessel shall remain on hire when
rendering salvage services to such property. This waiver
is without prejudice to any right the Vessel's Master,
Officers and Crew may have under any title.
If the Owners render assistance to such property in
distress on the basis of "no claim for salvage", then,
notwithstanding any other provisions contained in this
Charter Party and even in the event of neglect or default
of the Owners, Master, Officers or Crew: | 838-849

(i)  The Charterers shall be responsible for and shall
indemnify the Owners against payments made,
under any legal rights, to the Master, Officers and
Crew in relation to such assistance. | 850-853

(ii)  The Charterers shall be responsible for and shall
reimburse the Owners for any loss or damage
sustained by the Vessel or her equipment by
reason of giving such assistance and shall also
pay the Owners' additional expenses thereby
incurred. | 854-859

(iii)  The Charterers shall be responsible for any actual
or potential spill, seepage and/or emission of any
pollutant howsoever caused occurring within the
offshore site and any pollution resulting therefrom
wheresoever it may occur and including but not
limited to the cost of such measures as are
reasonably necessary to prevent or mitigate
pollution damage, and the Charterers shall
indemnify the Owners against any liability, cost
or expense arising by reason of such actual or
potential spill, seepage and/or emission. | 860-870

(iv)  The Vessel shall not be off-hire as a consequence
of giving such assistance, or effecting repairs
under Clause 18(c)(ii), and time taken for such
repairs shall not count against time granted under
Clause 13(c). | 871-875

(v)  The Charterers shall indemnify the Owners
against any liability, cost and/or expense; | 876-877

whatsoever in respect of any loss of life, injury,
damage or other loss to person or property
howsoever arising from such assistance. | 878-880

**19.  Lien.**

The Owners shall have a lien upon all cargoes and
equipment for all claims against the Charterers under
this Charter Party and the Charterers shall have a lien
on the Vessel for all monies paid in advance and not
earned. The Charterers will not suffer, nor permit to be
continued, any lien or encumbrance incurred by them
or their agents, which might have priority over the title
and interest of the Owners in the Vessel. Except as
provided in Clause 14, the Charterers shall indemnify
and hold the Owners harmless against any lien of
whatsoever nature arising upon the Vessel during the
Charter Period while she is under the control of the
Charterers, and against any claims against the Owners
arising out of the operation of the Vessel by the
Charterers or out of any neglect of the Charterers in
relation to the Vessel or the operation thereof.
Should the Vessel be arrested by reason of claims or
liens arising out of her operation hereunder, unless
brought about by the act or neglect of the Owners, the
Charterers shall at their own expense take all
reasonable steps to secure that within a reasonable time
the Vessel is released and at their own expense put up
bail to secure release of the Vessel. | 881-904

**20.  Sublet and Assignment.**

(a)  Charterers. - The Charterers shall have the option
of subletting, assigning or loaning the Vessel to any
person or company not competing with the Owners,
subject to the Owners' prior approval which shall not be
unreasonably withheld, upon giving notice in writing to
the Owners, but the original Charterers shall always
remain responsible to the Owners for due performance
of the Charter Party. The person or company taking such
subletting, assigning or loan and their contractors and
sub-contractors shall be deemed contractors of the
Charterers for all the purposes of this Charter Party.
The Owners make it a condition of such consent that
additional Hire shall be paid as agreed between the
Charterers and the Owners in Box 29, having regard to
the nature and period of any intended service of the
Vessel. | 905-920

(b)  Owners. - The Owners may not assign or transfer
any part of this Charter Party without the written approval
of the Charterers, which approval shall not be
unreasonably withheld. Approval by the Charterers of
such subletting or assignment shall not relieve the
Owners of their responsibility for due performance of
the part of the services which is sublet or assigned. | 921-928

**21.  Substitute Vessel**

The Owners shall be entitled at any time, whether before
delivery or at any other time during the Charter Period,
to provide a substitute vessel, subject to the Charterers'
prior approval which shall not be unreasonably withheld. | 929-933

**22.  BIMCO War Risks Clause "CONWARTIME 2004"**

(a)  For the purpose of this Clause, the words: | 934-935

(i)  "Owners" shall include the shipowners, bareboat
charterers, disponent owners, managers or other
operators who are charged with the management
of the Vessel, and the Master; and | 936-939

(ii)  "War Risks" shall include any actual, threatened
or reported, war; act of war; civil war; hostilities;
revolution; rebellion; civil commotion; warlike
operations; laying of mines; acts of piracy; acts of | 940-943

This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

terrorists; acts of hostility or malicious damage; | 944.
blockades (whether imposed against all vessels | 945.
or imposed selectively against vessels of certain | 946.
flags or ownership, or against certain cargoes or | 947.
crews or otherwise howsoever); by any person, | 948.
body, terrorist or political group, or the Government | 949.
of any state whatsoever, which, in the reasonable | 950.
judgement of the Master and/or the Owners, may | 951.
be dangerous or are likely to be or to become | 952.
dangerous to the Vessel, her cargo, crew or other | 953.
persons on board the Vessel. | 954.

**(b)** The Vessel, unless the written consent of the | 955.
Owners be first obtained, shall not be ordered to or | 956.
required to continue to or through, any port, place, area | 957.
or zone (whether of land or sea), or any waterway or | 958.
canal, where it appears that the Vessel, her cargo, crew | 959.
or other persons on board the Vessel, in the reasonable | 960.
judgement of the Master and/or the Owners, may be, | 961.
or are likely to be, exposed to War Risks. Should the | 962.
Vessel be within any such place as aforesaid, which | 963.
only becomes dangerous, or is likely to be or to become | 964.
dangerous, after her entry into it, she shall be at liberty | 965.
to leave it. | 966.

**(c)** The Vessel shall not be required to load contraband | 967.
cargo, or to pass through any blockade, whether such | 968.
blockade be imposed on all vessels, or is imposed | 969.
selectively in any way whatsoever against vessels of | 970.
certain flags or ownership, or against certain cargoes | 971.
or crews or otherwise howsoever, or to proceed to an | 972.
area where she shall be subject, or is likely to be subject | 973.
to a belligerent's right of search and/or confiscation. | 974.

**(d)** (i) The Owners may effect war risks insurance in | 975.
respect of the Hull and Machinery of the | 976.
Vessel and their other interests (including, but not | 977.
limited to, loss of earnings and detention, the crew | 978.
and their Protection and Indemnity Risks), and the | 979.
premiums and/or calls therefor shall be for | 980.
their account. | 981.

(ii) If the Underwriters of such insurance should require | 982.
payment of premiums and/or calls because, | 983.
pursuant to the Charterers' orders, the Vessel is | 984.
within, or is due to enter and remain within, or pass | 985.
through any area or areas which are specified by | 986.
such Underwriters as being subject to additional | 987.
premiums because of War Risks, then the actual | 988.
premiums and/or calls paid shall be reimbursed | 989.
by the Charterers to the Owners at the same time | 990.
as the next payment of hire is due, or upon | 991.
redelivery, whichever occurs first. | 992.

**(e)** If the Owners become liable under the terms of | 993.
employment to pay to the crew any bonus or additional | 994.
wages in respect of sailing into an area which is | 995.
dangerous in the manner defined by the said terms, | 996.
then the actual bonus or additional wages paid shall be | 997.
reimbursed to the Owners by the Charterers at the same | 998.
time as the next payment of hire is due, or upon | 999.
redelivery, whichever occurs first. | 1000.

**(f)** The Vessel shall have liberty:- | 1001.

(i) to comply with all orders, directions, recommen- | 1002.
dations or advice as to departure, arrival, routes, | 1003.
sailing in convoy, ports of call, stoppages, desti- | 1004.
nations, discharge of cargo, delivery, or in any | 1005.
other way whatsoever, which are given by the | 1006.
Government of the Nation under whose flag the | 1007.
Vessel sails, or other Government to whose laws | 1008.
the Owners are subject, or any other Government, | 1009.
body or group whatsoever acting with the power | 1010.
to compel compliance with their orders or direc- | 1011.

tions; | 1012.

(ii) to comply with the order, directions or recommen- | 1013.
dations of any war risks underwriters who have | 1014.
the authority to give the same under the terms of | 1015.
the war risks insurance; | 1016.

(iii) to comply with the terms of any resolution of the | 1017.
Security Council of the United Nations, the | 1018.
effective orders of any other Supranational body | 1019.
which has the right to issue and give the same, | 1020.
and with national laws aimed at enforcing the | 1021.
same to which the Owners are subject, and to | 1022.
obey the orders and directions of those who are | 1023.
charged with their enforcement; | 1024.

(iv) to discharge at any other port any cargo or part | 1025.
thereof which may render the Vessel liable to | 1026.
confiscation as a contraband carrier; | 1027.

(v) to call at any other port to change the crew or any | 1028.
part thereof or other persons on board the Vessel | 1029.
when there is reason to believe that they may be | 1030.
subject to internment, imprisonment or other | 1031.
sanctions. | 1032.

**(g)** If in accordance with their rights under the | 1033.
foregoing provisions of this Clause, the Owners shall | 1034.
refuse to proceed to the loading or discharging ports, | 1035.
or any one or more of them, they shall immediately | 1036.
inform the Charterers. No cargo shall be discharged at | 1037.
any alternative port without first giving the Charterers | 1038.
notice of the Owners' intention to do so and requesting | 1039.
them to nominate a safe port for such discharge. Failing | 1040.
such nomination by the Charterers within 48 hours of | 1041.
the receipt of such notice and request, the Owners may | 1042.
discharge the cargo at any safe port of their own choice. | 1043.

**(h)** If in compliance with any of the provisions of sub- | 1044.
clauses (b) to (g) of this Clause anything is done or not | 1045.
done, such shall not be deemed a deviation, but shall | 1046.
be considered as due fulfilment of this Charter Party. | 1047.

**23.** **War Cancellation Clause 2004** | 1048.
Either party may cancel this Charter Party on the | 1049.
outbreak of war (whether there be a declaration of war | 1050.
or not): | 1051.

**(a)** between any two or more of the following countries: | 1052.
the United States of America; Russia; the United | 1053.
Kingdom; France; and the People's Republic of China, | 1054.
or.. | 1055.

**(b)** between the countries stated in Box 30. | 1056.

**24.** **BIMCO Ice Clause for Time Charter Parties** | 1057.
**(a)** The Vessel shall not be obliged to force ice but, | 1058.
subject to the Owners' prior approval having due regard | 1059.
to its size, construction and class, may follow ice- | 1060.
breakers. | 1061.

**(b)** The Vessel shall not be required to enter or remain | 1062.
in any icebound port or area, nor any port or area where | 1063.
lights, lightships, markers or buoys have been or are | 1064.
about to be withdrawn by reason of ice, nor where on | 1065.
account of ice there is, in the Master's sole discretion, | 1066.
a risk that, in the ordinary course of events, the Vessel | 1067.
will not be able safely to enter and remain at the port or | 1068.
area or to depart after completion of loading or | 1069.
discharging. If, on account of ice, the Master in his sole | 1070.
discretion considers it unsafe to proceed to, enter or | 1071.
remain at the place of loading or discharging for fear of | 1072.
the Vessel being frozen in and/or damaged, he shall | 1073.
be at liberty to sail to the nearest ice-free and safe place | 1074.
and there await the Charterers' instructions. | 1075.

**(c)** Any delay or deviation caused by or resulting from | 1076.
ice shall be for the Charterers' account and the Vessel | 1077.
shall remain on-hire. | 1078.

This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

(d) Any additional premiums and/or calls required by the Vessel's underwriters due to the Vessel entering or remaining in any icebound port or area, shall be for the Charterers' account. 1079 1080 1081 1082

25. **Epidemic/Fever**
The Vessel shall not be ordered to nor bound to enter without the Owners' written permission any place where fever or epidemics are prevalent or to which the Master, Officers and Crew by law are not bound to follow the Vessel. 1083 1084 1085 1086 1087 1088
Notwithstanding the terms of Clause 13, Hire shall be paid for all time lost including any lost owing to loss of or sickness to the Master, Officers, Crew or passengers or to the action of the Crew in refusing to proceed in such place or to be exposed to such risks. 1088 1089 1090 1091 1092 1093

26. **General Average and New Jason Clause**
General Average shall be adjusted and settled in London unless otherwise stated in Box 31, according to York-Antwerp Rules, 1994. 1094 1095 1096 1097
Hire shall not contribute to General Average. Should adjustment be made in accordance with the law and practice of the United States of America, the following provision shall apply: 1098 1099 1100
"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owners are not responsible, by statute, contract or otherwise, the cargo, shippers, consignees or owners of the cargo shall contribute with the Owners in General Average to the payment of any sacrifices, loss or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. 1101 1102 1103 1104 1105 1106 1107 1108 1109 1110 1111 1112
If a salving vessel is owned or operated by the Owners, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the Owners, or their agents, may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the Owners before delivery". 1113 1114 1115 1116 1117 1118 1119 1120

27. **Both-to-Blame Collision Clause**
If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Owners in the navigation or the management of the Vessel, the Charterers will indemnify the Owners against all loss or liability to the other or non-carrying ship or her owners insofar as such loss or liability represent loss of or damage to, or any claim whatsoever of the owners of any goods carried under this Charter Party paid or payable by the other or non-carrying ship or her owners to the owners of the said goods and set-off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the Vessel or the Owners. The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or objects other than or in addition to the colliding ships or objects are at fault in respect of a collision or contact. 1121 1122 1123 1124 1125 1126 1127 1128 1129 1130 1131 1132 1133 1134 1135 1136 1137 1138 1139

28. **Health and Safety**
The Owners shall comply with and adhere to all applicable international, national and local regulations pertaining to health and safety, and such Charterers' 1140 1141 1142 1143

instructions as may be appended hereto. 1144

29. **Drugs and Alcohol Policy**
The Owners undertake that they have, and shall maintain for the duration of this Charter Party, a policy on Drugs and Alcohol Abuse applicable to the Vessel (the "D & A Policy") that meets or exceeds the standards in the OCIMF Guidelines for the Control of Drugs and Alcohol Onboard Ship 1995 as amended from time to time.
The Owners shall exercise due diligence to ensure that the D & A Policy is understood and complied with on and about the Vessel. An actual impairment, shall not in and itself mean that the Owners have failed to exercise due diligence. 1145 1146 1147 1148 1149 1150 1151 1152 1153 1154 1155 1156

30. **Taxes**
Within the day rate the Owners shall be responsible for the taxes stated in Box 32 and the Charterers shall be responsible for all other taxes.
In the event of change in the Area of Operation or change in local regulation and/or interpretation thereof, resulting in an unavoidable and documented change of the Owners' tax liability after the date of entering into the Charter Party or the date of commencement of employment, whichever is the earlier, Hire shall be adjusted accordingly. 1157 1158 1159 1160 1161 1162 1163 1164 1165 1166 1167

31. **Early Termination**
(a) **At Charterers' Convenience** - The Charterers may terminate this Charter Party at any time by giving the Owners written notice of termination as stated in Box 14, upon expiry of which, this Charter Party will terminate. Upon such termination, Charterers shall pay the compensation for early termination stated in Box 13 and the demobilisation charge stated in Box 15, as well as Hire or other payments due under the Charter Party up to the time of termination. Should Box 13 be left blank, Clause 31(a) shall not apply. 1168 1169 1170 1171 1172 1173 1174 1175 1176 1177
(b) **For Cause** - If either party becomes informed of the occurrence of any event described in this Clause that party shall so notify the other party promptly in writing and in any case within 3 days after such information is received. If the occurrence has not ceased within 3 days after such notification has been given, this Charter Party may be terminated by either party, without prejudice to any other rights which either party may have, under any of the following circumstances: 1178 1179 1180 1181 1182 1183 1184 1185 1186
(i) **Requisition** - If the government of the state of registry and/or the flag of the Vessel, or any agency thereof, requisitions for hire or title or otherwise takes possession of the Vessel during the Charter Period. 1187 1188 1189 1190 1191
(ii) **Confiscation** - If any government, individual or group, whether or not purporting to act as a government or on behalf of any government, confiscates, requisitions, expropriates, seizes or otherwise takes possession of the Vessel during the Charter Period (other than by way of arrest for the purpose of obtaining security). 1192 1193 1194 1195 1196 1197
(iii) **Bankruptcy** - In the event of an order being made or resolution passed for the winding up, dissolution, liquidation or bankruptcy of either party (otherwise than for the purpose of reconstruction or amalgamation) or if a receiver is appointed or if it suspends payment or ceases to carry on business; 1198 1199 1200 1201 1202 1203 1204
(iv) **Loss of Vessel** - If the Vessel is lost or becomes a constructive total loss, or is missing unless the Owners promptly state their intention to provide, and do in fact provide, within 14 days of the Vessel 1205 1206 1207 1208 1209

This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

being lost or missing, at the port or place from | 1210
which the Vessel last sailed (or some other | 1211
mutually acceptable port or place) a substitute | 1212
vessel pursuant to Clause 21.- in the case of | 1213
termination, Hire shall cease from the date the | 1214
Vessel was lost or, in the event of a constructive | 1215
total loss, from the date of the event giving rise to | 1216
such loss. If the date of loss cannot be ascertained, | 1217
or the Vessel is missing, payment of Hire shall | 1218
cease from the date the Vessel was last reported. | 1219

(v) Breakdown. - if, at any time during the term of | 1220
this Charter Party a breakdown of the Owners' | 1221
equipment or Vessel result in the Owners being | 1222
unable to perform their obligations hereunder for | 1223
a period exceeding that stated in Box 33 and have | 1224
not initiated reasonable steps within 48 hours to | 1225
remedy the non-performance or provided a | 1226
substitute vessel pursuant to Clause 21. | 1227

(vi) Force Majeure. - if a force majeure condition as | 1228
defined in Clause 32 prevents or hinders the | 1229
performance of the Charter Party for a period | 1230
exceeding 15 consecutive days from the time at | 1231
which the impediment causes the failure to | 1232
perform if notice is given without delay or, if notice | 1233
is not given without delay, from the time at which | 1234
notice thereof reaches the other party. | 1235

(vii) Default. - if either party is in repudiatory breach | 1236
of its obligations hereunder. | 1237
Termination as a result of any of the above mentioned | 1238
causes shall not relieve the Charterers of any obligation | 1239
for Hire and any other payments. | 1240

32. Force Majeure | 1241
Neither party shall be liable for any loss, damage or | 1242
delay due to any of the following force majeure events | 1243
and/or conditions to the extent the party invoking force | 1244
majeure is prevented or hindered from performing any | 1245
or all of their obligations under this Charter Party, | 1246
provided they have made all reasonable efforts to avoid, | 1247
minimize or prevent the effect of such events and/or | 1248
conditions: | 1249
(a) acts of God; | 1250
(b) any Government requisition, control, intervention, | 1251
requirement or interference; | 1252
(c) any circumstances arising out of war, threatened | 1253
act of war or warlike operations, acts of terrorism, | 1254
sabotage or piracy, or the consequences thereof; | 1255
(d) riots, civil commotion, blockades or embargoes; | 1256
(e) epidemics; | 1257
(f) earthquakes, landslides, floods or other extraor- | 1258
dinary weather conditions; | 1259
(g) strikes, lockouts or other industrial action, unless | 1260
limited to the Employees of the party seeking to invoke | 1261
force majeure; | 1262
(h) fire, accident, explosion except where caused by | 1263
negligence of the party seeking to invoke force majeure; | 1264
(i) any other similar cause beyond the reasonable | 1265
control of either party. | 1266
The party seeking to invoke force majeure shall notify | 1267
the other party in writing within 2 working days of the | 1268
occurrence of any such event/condition. | 1269

33. Confidentiality | 1270
All information or data provided or obtained in | 1271
connection with the performance of this Charter Party | 1272
is and shall remain confidential and not be disclosed | 1273
without the prior written consent of the other party. The | 1274
parties shall use their best efforts to ensure that such | 1275
information shall not be disclosed to any third party by | 1276

any of their sub-contractors, Employees and agents. | 1277
This Clause shall not apply to any information or data | 1278
that has already been published or is in the public | 1279
domain. | 1280
All information and data provided by a party is and shall | 1281
remain the property of that party. | 1282

34. BIMCO Dispute Resolution Clause | 1283
*(a) This Charter Party shall be governed by and | 1284
construed in accordance with English law and any | 1285
dispute arising out of or in connection with this Charter | 1286
Party shall be referred to arbitration in London in | 1287
accordance with the Arbitration Act 1996 or any statutory | 1288
modification or re-enactment thereof save to the extent | 1289
necessary to give effect to the provisions of this Clause. | 1290
The arbitration shall be conducted in accordance with | 1291
the London Maritime Arbitrators Association (LMAA) | 1292
Terms current at the time when the arbitration | 1293
proceedings are commenced. | 1294
The reference shall be to three arbitrators. A party | 1295
wishing to refer a dispute to arbitration shall appoint its | 1296
arbitrator and send notice of such appointment in writing | 1297
to the other party requiring the other party to appoint its | 1298
own arbitrator within 14 calendar days of that notice | 1299
and stating that it will appoint its arbitrator as sole | 1300
arbitrator unless the other party appoints its own | 1301
arbitrator and gives notice that it has done so within the | 1302
14 days specified. If the other party does not appoint its | 1303
own arbitrator and give notice that it has done so within | 1304
the 14 days specified, the party referring a dispute to | 1305
arbitration may, without the requirement of any further | 1306
prior notice to the other party, appoint its arbitrator as | 1307
sole arbitrator and shall advise the other party | 1308
accordingly. The award of a sole arbitrator shall be | 1309
binding on both parties as if he had been appointed by | 1310
agreement. | 1311
Nothing herein shall prevent the parties agreeing in | 1312
writing to vary these provisions to provide for the | 1313
appointment of a sole arbitrator. | 1314
In cases where neither the claim nor any counterclaim | 1315
exceeds the sum of US$50,000 (or such other sum as | 1316
the parties may agree) the arbitration shall be conducted | 1317
in accordance with the LMAA Small Claims Procedure | 1318
current at the time when the arbitration proceedings | 1319
are commenced. | 1320
*(b) This Charter Party shall be governed by and | 1321
construed in accordance with Title 9 of the United States | 1322
Code and the Maritime Law of the United States and | 1323
any dispute arising out of or in connection with this | 1324
Charter Party shall be referred to three persons at New | 1325
York, one to be appointed by each of the parties hereto, | 1326
and the third by the two so chosen; their decision or | 1327
that of any two of them shall be final, and for the | 1328
purposes of enforcing any award, judgement may be | 1329
entered on an award by any court of competent | 1330
jurisdiction. The proceedings shall be conducted in | 1331
accordance with the rules of the Society of Maritime | 1332
Arbitrators, Inc. | 1333
In cases where neither the claim nor any counterclaim | 1334
exceeds the sum of US$50,000 (or such other sum as | 1335
the parties may agree) the arbitration shall be conducted | 1336
in accordance with the Shortened Arbitration Procedure | 1337
of the Society of Maritime Arbitrators, Inc. current at | 1338
the time when the arbitration proceedings are | 1339
commenced. | 1340
*(c) This Charter Party shall be governed by and | 1341
construed in accordance with the laws of the place | 1342
mutually agreed by the parties and any dispute arising | 1343
out of or in connection with this Charter Party shall be | 1344

This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

referred to arbitration at a mutually agreed place, subject to the procedures applicable there. — 1345

(d)   Notwithstanding (a), (b) or (c) above, the parties may agree at any time to refer to mediation any difference and/or dispute arising out of or in connection with this Charter Party. — 1346, 1347, 1348, 1349

In the case of a dispute in respect of which arbitration has been commenced under (a), (b) or (c) above, the following shall apply: — 1350, 1351, 1352, 1353

(i)   Either party may at any time and from time to time elect to refer the dispute or part of the dispute to mediation by service on the other party of a written notice (the "Mediation Notice") calling on the other party to agree to mediation. — 1354, 1355, 1356, 1357, 1358

(ii)   The other party shall thereupon within 14 calendar days of receipt of the Mediation Notice confirm that they agree to mediation, in which case the parties shall thereafter agree a mediator within a further 14 calendar days, failing which on the application of either party a mediator will be appointed promptly by the Arbitration Tribunal ("the Tribunal") or such person as the Tribunal may designate for that purpose. The mediation shall be conducted in such place and in accordance with such procedure and on such terms as the parties may agree or, in the event of disagreement, as may be set by the mediator. — 1359, 1360, 1361, 1362, 1363, 1364, 1365, 1366, 1367, 1368, 1369, 1370, 1371

(iii)   If the other party does not agree to mediate, that fact may be brought to the attention of the Tribunal and may be taken into account by the Tribunal when allocating the costs of the arbitration as between the parties. — 1372, 1373, 1374, 1375

(iv)   The mediation shall not effect the right of either party to seek such relief or take such steps as it considers necessary to protect its interest. — 1376, 1377, 1378, 1379

(v)   Either party may advise the Tribunal that they have agreed to mediation. The arbitration procedure shall continue during the conduct of the mediation but the Tribunal may take the mediation timetable into account when setting the timetable for steps in the arbitration. — 1380, 1381, 1382, 1383, 1384, 1385

(vi)   Unless otherwise agreed or specified in the mediation terms, each party shall bear its own costs incurred in the mediation and the parties shall share equally the mediator's costs and expenses. — 1386, 1387, 1388, 1389, 1390

(vii)   The mediation process shall be without prejudice and confidential and no information or documents disclosed during it shall be revealed to the Tribunal except to the extent that they are disclosable under the law and procedure governing the arbitration. — 1391, 1392, 1393, 1394, 1395

(Note: The parties should be aware that the mediation process may not necessarily interrupt time limits.) — 1396, 1397

If Box 34 in PART I is not appropriately filled in, sub-clause 34(d) of this Clause shall apply. Sub-clause (d) shall apply in all cases. — 1398, 1399

* Sub-clauses 34(a), 34(b) and 34(c) are alternatives; indicate alternative agreed in Box 34. — 1400, 1401, 1402

**35.   Notices** — 1403

(a).   All notices given by either party or their agents to the other party or their agents in accordance with the provisions of this Charter Party shall be in writing. — 1404, 1405, 1406

(b).   For the purposes of this Charter Party, "in writing" shall mean any method of legible communication. A notice may be given by any effective means including, but not limited to, cable, telex, fax, e-mail, registered or recorded mail, or by personal service. — 1407, 1408, 1409, 1410, 1411

**36.   Headings** — 1412

The headings of this Charter Party are for identification only and shall not be deemed to be part hereof or be taken into consideration in the interpretation or construction of this Charter Party. — 1413, 1414, 1415, 1416

**37.   Severance** — 1417

If by reason of any enactment or judgement any provision of this Charter Party shall be deemed or held to be illegal, void or unenforceable in whole or in part, all other provisions of this Charter Party shall be unaffected thereby and shall remain in full force and effect. — 1418, 1419, 1420, 1421, 1422, 1423

**38.   Entire Agreement** — 1424

This Charter Party, including all Annexes referenced herein and attached hereto, is the entire agreement of the parties, which supersedes all previous written or oral understandings and which may not be modified except by a written amendment signed by both parties. — 1425, 1426, 1427, 1428, 1429



This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

### 39. Arbitration

In addition to Box 34 and Clause 34, for the sake of clarification, any and all differences and disputes of whatsoever nature arising out of this contract shall be put to arbitration in the City of Houston, Texas, pursuant to the Maritime Laws of the United States, The Federal Arbitration Act, and the Rules of the Houston Maritime Arbitrators Association, before a panel of three persons, consisting of one Arbitrator to be appointed by each of the parties hereto and a third by the two so chosen. Their decision or that of any two of the three on any point or points shall be final. Until such time as the Arbitrators formally close the hearings, either party shall have the right by written notice served on the Arbitrators and on the other party to specify further disputes or differences under this contract for hearing and determination. The Arbitrators may grant any relief which they, or a majority of them, deem just and equitable and within the scope of the agreement of the parties, including, but not limited to, specific performance. Awards made in pursuance to this Clause may include costs, including a reasonable allowance for attorney's fees, and judgment may be entered upon any Award made hereunder in any Court having jurisdiction in the premises.

### 40. Crew

Throughout the term of this Charter, the Owners are responsible for the transit of its masters and members of the crew to the agreed upon nearest airport in the port of embarkation in the Area of Operation. Charterers shall be responsible for the transit from the airport to the Vessel. At crew change, should weather or other reasons beyond the control of Owners prevent the crew change from occurring as scheduled, Charterers shall provide for all meals and lodging for the Owners' crew so affected. If the Owners' crew arrives earlier than scheduled for the crew change or misses relevant flights, Charterer is not responsible for the meals & lodging of the affected crew during such time out of the scheduled crew change.

### 41. Vessel Importation/Exportation and Customs Clearance in and out of Mexico

Owners shall import and export the Vessel into and out of Mexico, including clearing it through Mexican customs. Owners are allowed 4 business days to clear in the Vessel and 4 business days to clear out the Vessel while on-hire. Should Owners be the sole cause of a delay in clearing in or out exceeding the allowed days, the Vessel may be taken off-hire for the period of such delay. Charterers shall reimburse all Owners' costs, fees, expenses to import and export the Vessel (including its spares and equipment) and clear customs.

### 42. Navigation Permits

Charterers shall be fully responsible for obtaining all Mexican navigation permits and any associated authorization or approval for the Vessel to operate in the intended area of operation.

### 43.

This clause intentionally left blank.

### 44. Marine Crew Visa and Training

Owners shall obtain visas for the marine crew. Charterers shall reimburse Owners USD $1,000.00 per visa obtained for the first 60 members of the marine crew. Charterers shall reimburse Owners for the cost of any Charterers' or Charterers' client required training of the first 60 members of the marine crew, including meals, lodging and payroll during such training, necessary to work in the area of operation.

### 45. PEMEX Required Personnel

Charterers are responsible for supplying the Mexican Master and Mexican onboard Doctor, if required.

### 46. Importation of Spares

Without altering the obligations set out in Clause 9(d), Owners may arrange for transportation and importation of spares for the Vessel and Sat. System with all associated costs reimbursed to Owners by Charterers so long as Charterers have provided approval to Owners. The reimbursement of costs by Charterers under this clause shall be limited to the actual costs of Owners.

### 47. ROV Demobilization Fee

Prior to the Vessel's departure from Ingleside, Tx., a ROV demobilization fee of USD 15,000 shall be be paid to Owners by Charterers.

### 48. Invoicing and Payment

Invoices for charterhire shall be issued in advance. Each invoice shall be for 30 days of hire. Each invoice shall be due and paid on or before the 1st day of the 30 day term covered by the invoice.

All other Owners' invoices shall be due and paid no later than 15 days from receipt of the invoice by Charterers.

### 49. Sat System Downtime

Notwithstanding Clause 13, in the event the Sat System has a breakdown and has become inoperable and there is no available Maintenance Allowance but the Vessel is still capable of progressing Charterers' work, including working on, but not limited to, surface diving, topside, ROV, etc., then Charterers' sole remedy is to be credited USD 15,773 per day, pro rata, until the Sat System is back in service.

### 50. Catering and Hotel Services

Notwithstanding Clause 6(c)(i), whilst the Vessel is under this Charter, Charterers shall provide and pay for the Catering Crew and suitable provisions (3 meals per day, including 1 hot night meal, bottled water, and sodas) including full hotel services for all onboard, including the marine crew, at no cost to Owner. The standard/content of meals for the marine crew to be agreed with the Owners' senior representative onboard the Vessel.

### 51. Medical/Hospital Supplies

Prior to the Vessel's departure from Ingleside, Tx. an inventory will be taken of the onboard Medical/Hospital supplies, the results of which to be agreed by Owners and Charterers. During the term of this Charter, Charterers are responsible for maintaining and re-supplying the Medical/Hospital supplies at no cost to Owners and shall redeliver the Vessel with the same quantity and quality of Medical/Hospital supplies as were inventoried prior to the Vessel's departure from Ingleside, Tx.

Annex "A"



# Lewek Toucan

Multipurpose offshore support vessel with dive support capabilities



Lewek Toucan is an advanced multipurpose offshore support vessel with excellent dive support capabilities, as well as a DP 2 dynamic positioning system, accommodations for a crew of 100, a 920 M2 /1,000 ton cargo deck and helideck. The 120 ton capacity crane has a 12 metres reach and is capable of operating in water depths reaching 2,000 m.

## SPECIFICATIONS

LENGTH
88.4 m

BREADTH MOULDED
20.6 m

DEPTH MOULDED
7.8 m

DRAFT DESIGNED
6.6 m

DEADWEIGHT
4019.62 T

GROSS TONNAGE
4854 T

DECK AREA
920 m²

DECK STRENGTH
5.5t/m²

# Lewek Toucan General Specification



## CLASSIFICATION

ABS ✠ 1A1, Fire Fighting Class 1,
Offshore Support Vessel, DP 2

Year Built................................................................2008
Flag.........................................................................Panama

## MAIN PARTICULARS

Length Overall........................................................88.4 m
Length W.L..............................................................84.56 m
Breadth Moulded....................................................20.6 m
Depth, main deck....................................................7.8 m
Draft Design...........................................................6.6 m

Deadweight............................................................4019.82 T
Gross Tonnage.......................................................4654 T

## DYNAMIC POSITIONING

Kongsberg DP2 System
1 x Acoustic HIPAP 500
1 x Taut wire Bandak MK15B
1 x Fan beam MK4.2
2 x FUGRO DGPS

www.emas.com
marketing@emas.com

## MANUEVERUNG AND PROPULSION SYSTEM

Type......................................2 x Straight Shaft Diesel Mechanical
Main Engine............................................2 x BERGEN B32:40V12P
Propulsion...............................................2 x Kamewa - Ulstein CPP
Power.......................................................................2 x 6000KW

Power.......................................................................2 x 6000KW
Type........................................................1 x Forward azimuth thrusters
Make.............................................................Ulstein Aquamaster, UL 1201
Power.....................................................14 Ton, 1 x 620 kW
Type........................................2 x Forward transverse tunnel thrusters
Make.................................Kamewa Ulstein, TT 1650 DPN CP & TT1650
Power.....................................................1 x 850 kW & 1 x 750 kW
Type........................................2 x Aft transverse tunnel thrusters
Make.................................Kamewa Ulstein, TT 1650 DPN CP
Power.......................................................................2 x 750 kW

## FRESH WATER PRODUCER

Type...........................................Reverse Osmosis   30m3 / day

## SEWAGE SYSTEM

Type.............................................Hamworthy ST 8, Super Trident

* This vessel specification is given in good faith and assumed to be accurate at the time of print.
** Owners will not be liable for errors, omissions, or misprints published. Owners reserve the rights to amend this specification without notification.

BFC

# Annex "A"





## POWER GENERATION

Type.................................................Shaft Generator
Make.................................................AVK Generator
Power................................2 x 2116ekw, 440V/60Hz

Type..............................................Main Generator set
Make.................................................CAT 3412 generators
Power................................590ekw, 440V/60Hz

Make.................................................Cummins KTA50D generators
Power................................1200ekw, 440V/60Hz

Total Installed Power....................................7816ekw

Emergency Generator........AT 3056T, 1 x 99ekw, 440V/60Hz

## ACCOMMODATIONS

The ship is arranged with an accommodation for total 100
persons plus hospital:
Berth / Cabin..............................................
Berth / Cabin..............................8 x Single Cabins
Berth / Cabin............................14 x 2 Men Cabins
Berth / Cabin............................16 x 4 Men Cabins

## CRANES

Maker.................................................Huisman
Type.........................120T AHC Knuckle Boom Crane

*Main Hoist:*

Safe working load at 7.4 - 12 m radius, in air..........120 MT
Safe working load at 30 m radius, in air................30 MT
Hook travel.............................................approx. 2000 m
No. of falls.................................................1
No. of layers on drum for 2000m wire......................2

*Active Heave Compensation*

Maximum load.............................................120 MT
Peak speed, at full load, outer layer............approx. 90 m/min
Resulting crane tip motion..............5.0 m with period 12 sec

*Aux Hoist:*

Safe working load at 7.5 - 32 m radius, in air............24 MT
Hook travel.............................................approx. 300 m
No. of falls.................................................1
No. of layers on drum for 300m wire......................2

*Active Heave Compensation*

Maximum load..............................................24 MT
Peak speed, at full load, outer layer............approx. 100 m/min
Resulting crane tip motion..............6.4 m with period 12 sec

## NAVIGATION AND COMMUNICATION EQUIPMENT

Maritime VSAT Antenna 1.6 meter C-Band
PA system, Integrated Telephone, Sound Powered Telephone
Radio Plant with Satellite Communication System,
Life Boat Radios, Radar Transponder,
Radar Plant, Global Positioning System,
Gyro compass, Magnetic Compass, Autopilot,
Echo Sounder, Doppler Speed Log, AIS & VDR,
TV-FM-SAT System, CCTV,

## FIREFIGHTING EQUIPMENT

*Fire extinguishers:* Powder, foam and CO2 extinguishers
according to regulations in force.
*Fire hoses with equipment:* Adjacent to each of the fire
hydrants; a 2" fire hose with length of at least 15 meters.
The hoses are equipped with combined jet nozzles and fog
nozzles, with coupling connections to the hydrant.
One (1) off international coupling.
Fire axes fitted according to requirements from the National
Authorities.

## SAFETY EQUIPMENT

Safety equipments shall be based upon the regulation of the
vessel, for a total number of persons on board of 100
persons.

FRC Boat........................One (1) SOLAS FRC boat Mako 655,
                Diesel driven water jet complete with davit
Rescue Boat (MOB) with Davits

*Life Raft*..............................................12 x 25 persons.
Inflatable rubber life rafts of approved type. Life rafts capacity
according to national authority's requirements. Raft launching
crane of approved type, allowing effective launching of rafts, and
not requiring manual reloading after use.

*Lifebuoys, Jackets*
Lifebuoys of plastics of approved type. Numbers and
equipments are according to the National Authorities
requirements. Parachutes signals and equipments are
according to rules.

## HELIDECK

Type............................22.2 M Octagonal Aluminium Helideck

## INSURANCE

Insurance policies (as applicable) to be procured and
maintained by the Owners under Clause 17:

(1) Marine Hull Insurance. – Hull and Machinery insurance shall be provided with limits equal to those normally carried by the Owners for the Vessel.

(2) Protection and Indemnity (Marine Liability Insurance. –
Protection and Indemnity (P&I) or Marine Liability Insurance with coverage equivalent to the cover provided by members of the International Group Protection and Indemnity
Associations with a limit of cover no less than USD 10,000,000
for any one event. The cover shall include liability for collision and damage to fixed and floating objects to the extent not covered by the insurance in (1) above.

(3) General Third Party Liability Insurance. – To the extent not covered by the insurance in (2) ABOVE, Coverage shall be for:
Bodily Injury USD 10,000,000    per person.
Property Damage USD 10,000,000    per occurrence.

(4) Workmen's Compensation and Employer's liability insurance for Employees: –
To the extent not covered in the insurance in (2) above, covering Owners' employees and other persons for whom Owners are liable as employer pursuant to applicable law for
statutory benefits as set out and required by local law in area of operation or area in which the Owners may become legally obliged to pay benefits.

~~(5)    (Comprehensive General Automobile Liability Insurance. –~~
~~Covering all owned, hired and non-owned vehicles, coverage shall be full~~
~~Bodily Injury - According to the local law.~~
~~Property Damage - In an amount equivalent to~~
~~single limit per occurrence.~~

(6)(5)    Such other insurances as may be agreed.

This computer generated form is printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document, which is not
clearly visible, the original BIMCO approved document shall apply. BIMCO assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO document and this document.



Guillermo Iturbide García

De:  Gerson Arreola <G.Arreola@rangeroffshoreinc.com>
Enviado el:  Viernes, 31, de enero de 2014 07:17 p.m.
Para:  Guillermo Iturbide García
CC:  Jose Cesar Velazquez Muñoz; Oscar Ernesto Valle Mata; Tom Cunningham; Jim Lara; Bill Lara
Asunto:  RE: lewek toucan

Guillermo,

I have been authorized by Tom and Bill to go ahead and give you a reduced transit rate of $88,000 USD., which will start Sunday at 12:00, and will end upon arrival to the Carmen Sea Buoy. We will take your word and begin arrangements to supply any necessary supplies/equipment for the job scope tomorrow in order to have vessel leave dockside as soon as possible. We will begin demobilization of the ROV upon signature of the vessel On-Hire survey; and will sail to Mexico upon completion of ROV demobilization and mobilization of all job related equipment.

To make sure we are all in the same page, could you please add the below clause to the last page of the BIMCO:

"The parties agree that the vessel shall be considered on hire as of 12 noon Sunday, February 3, 2014. The parties agree that a discounted charter hire rate of USD 88,000 per day shall apply until the vessel reaches the Carmen sea-buoy".

Thanks and Regards,



**Gerson Arreola, MBA.**
General Director – Ranger Offshore Mexico S de R.L. de C.V.



Ranger Offshore Mexico
S. de R.L. de C.V.
Ave. Edzna # 49-A
Parque Ind. Mundo Maya
Ciudad Del Carmen, Camp.

Ranger Offshore Inc.
10370 Richmond Ave.
Suite 1000
Houston, TX 77042

(office): +1 (832) 482-4828
(mobile): +1 (323) 243-4226
(Mex. mob.)+52 (938) 461-8975.
(email): g.arreola@rangeroffshoreinc.com
http://www.rangeroffshoreinc.com

**From:** Guillermo Iturbide García [mailto:giturbide@tradeco.com]
**Sent:** Friday, January 31, 2014 6:36 PM
**To:** Gerson Arreola
**Cc:** Jose Cesar Velazquez Muñoz; Oscar Ernesto Valle Mata
**Subject:** lewek toucan

Dear Gerson

Per our telephone conversation with Cesar Velazquez

1

1.- Ranger to send asap and during the weekend the inspector from LOC or EXPIDENA for a preliminary checklist;

2.- Payment for 3.4 M USD to be issue by Tuesday 4th because Monday is holiday in Mexico. We would like to have the on hire by the 4th but in order to express the interest on the Toucan we could sign the ON Hire by Sunday 2rd at 12:00 by one of our representatives at the site (Ingleside,tx).Then the contract starts with the demob of the rov during Sunday and if necessary Monday;

3.- if its accepted Tradeco sends immediately the BIMCO signed, then Ranger issues the Invoice to Tradeco for 30 days in advance + demob of ROV;.

4.-Ranger provides a discount day rate during transit to Mexico other wise Sunday and Monday were not considered at our budget. If not we don't have any option than signing BIMCO by the 4th.

5.-Tradeco to send official instruction to the BANK where the payment will be released by the 4th. With this instruction then Lewek Toucan is allowed to sail destination Mexico

We really want to work with you guys so please help us on this.Lets do this final to get into an agreement. We have been trying to close this for almost a year.

Kind Regards

Ing. Guillermo Iturbide García
Subgerente de Comercializacion y Fletamentos
Tradeco Infraestructura/ Operaciones y Rentas Costa Afuera
Av. Insurgentes Sur 1647 Piso 15 Col San Jose Insurgentes
Dlg. Benito Juarez, CP. 03900, México D.F.
Office: +52- 55 22822300 ext 15027
Mex: Mob: +52 1 55 1892 4674
US Mob 1-281-254-4273 (only when in the US).
BB PIN: 28C8B4C4



Ing. Guillermo Iturbide García
Subgerente de Comercialización y Fletamentos

giturbide@tradeco.com
Tel: 5482 7600 Ext: 15027
www.tradeco.com

Insurgentes Sur No.1647 | Col. San José Insurgentes | Del. Benito Juárez | C.P.03900 | México D.F.

The contents of this e-mail and its attachments are intended solely for the addressee(s) hereof. In addition, this e-mail transmission may be confidential and it may be subject to privilege protecting communications between attorneys or solicitors and their clients. If you are not the named addressee, or if this message has been addressed to you in error, you are directed not to read, disclose, reproduce, distribute, disseminate or otherwise use this transmission. Delivery of this message to any person other than the intended recipient(s) is not intended in any way to waive privilege or confidentiality. If you have received this transmission in error, please alert the sender by reply e-mail; we also request that you immediately delete this message and its attachments, if any.



# Exhibit B

First published 2012

Published by BIMCO's Area

Copyright, published by BIMCO, Copenhagen

# BIMCO

## CHARTER PARTY GUARANTEE
### CHARTERERS' GUARANTEE OF SUMS PAYABLE AND LIABILITIES UNDER TIME CHARTER PARTY

| 1. Place and date of guarantee<br>Houston, Texas<br>May 27, 2014 | | 2. Date of charter party<br>January 31, 2014 |
|---|---|---|
| 3. Guarantor (Cl. 1)<br><br>(i) Name of Guarantor:<br>Grupo Tradeco, S.A. de C.V.<br><br>(ii) Address of registered office:<br>Insurgentes Sur #1647<br>Col. San Jose Insurgentes<br>Delegacion Benito Juarez<br>Distrito Federal, Mexico<br>C.P. 03900<br><br>(iii) Country of Incorporation:<br>Mexico | 4. Owners (Cl. 1)<br><br>(i) Name of Owners:<br>Ranger Offshore Mexico, S. de R.L. de C.V.<br><br>(ii) Address of registered office:<br>Ava. Edna 49A Parque Ind.<br>Mundo Maya, Ciudad del Carmen, Campeche C.P. 24153 Mexico<br><br>(iii) Country of Incorporation:<br>Mexico | 5. Charterers (Cl. 1)<br><br>(i) Name of Charterers:<br>Tradeco Infraestructura, S.A. de C.V.<br><br>(ii) Address of registered office:<br>Insurgentes Sur #1647<br>Col. San Jose Insurgentes<br>Delegacion Benito Juarez<br>Distrito Federal, Mexico<br>C.P. 03900<br><br>(iii) Country of Incorporation:<br>Mexico |
| 6. Vessel's name (Cl. 1)<br>MV Lewek Toucan | 7. Rate of interest per annum (Cl. 2(a))<br>12% | 8. Maximum liability (state amount) (Cl. 2(a))<br>(if this Box is left blank, unlimited liability shall apply)<br>This Box left blank |
| 9. Guarantors' liability period (state number of months; if left blank, twelve (12) months after redelivery shall apply) (Cl. 3(c))<br>This Box left blank | 10. Governing law (Cl. 11(a))<br>Texas Law | 11. Exclusive jurisdiction (Cl. 11(b))<br>Houston, Texas for jurisdiction and venue. |

1.  **Definitions**

2.  "Charter Party" means the charter party dated as per Box 2, including any amendment thereto.

3.  "Charterers" means the party stated in Box 5.

4.  "Demand" means a Demand for payment under this Guarantee made in accordance with Clause 6 (Demands for
5.  Payment).

6.  "Guarantee" means this document and is made on the date and at the place stated in Box 1.

7.  "Guarantor" means the party stated in Box 3.

8.  "Guaranteed Amount(s)" means any:

9.  (a) sum or sums due from the Charterers to the Owners under or in connection with the Charter Party, including
10. any recoverable costs and expenses that may be incurred by the Owners in enforcing any of their rights under or in
11. connection with the Charter Party, whether in legal proceedings or otherwise; and

12. (b) any liability on the part of the Owners to pay the cost of bunkers, port charges, stevedoring costs or any other
13. costs arising during the course of the Charter Party which would properly be the responsibility of the Charterers.

14. "Owners" means the owners/disponent owners stated in Box 4.

15. "Vessel" means the vessel named in Box 6.

16. 2.  **Guarantee**
17. (a) In consideration of the Owners agreeing to charter the Vessel to the Charterers and accepting this Guarantee
18. as security for the payment by the Charterers of sums due under this Charter Party and for other good and valuable

This document is a computer generated BIMCO Charter Party Guarantee printed by authority of BIMCO. Any insertion or deletion to the Guarantee must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

consideration expressly acknowledged, and subject only to Sub-clause 2(b) below, the Guarantor hereby unconditionally and irrevocably guarantees (as primary obligor and not by way of secondary liability only) to pay any Guaranteed Amount within ten (10) banking days (in the Guarantor's country of residence) following a Charterers to the date of payment by the Guarantor.

(b) If within ten (10) banking days after receipt of a Demand the Guarantor receives (i) a copy of the written notice of a disputed invoice from the Charterers that was timely presented to Owners in strict compliance with Clause 12 (e) of the Charter Party stating that they dispute the Owners' claim for the Guaranteed Amount and (ii) evidence that the matter has been referred to court or arbitration (as may be applicable) under the Charter Party then the Guarantor shall not be obliged to make any payment under this Guarantee until the latest of thirty (30) days after the dispute has been finally determined, whether by way of agreement, or by way of final unappealable arbitration award (including an interim or partial award) or court judgment, in each case following the exhaustion of any appeal process therefrom. The Guarantor shall immediately provide the Owners with a copy of the written notice and the evidence of referral of the matter to court or arbitration. Nothing in this paragraph will relieve Guarantor of paying any Guaranteed Amount within five (5) banking days as prescribed in Sub-clause 2(a) above if Charterer fails to timely present to Owners a written notice of a disputed invoice in strict compliance with Clause 12(e) of the Charter Party.

(c) The Guaranteed Amount, as may be varied by an award, judgment or agreement, shall be paid immediately following the issue of such award or judgment obtained in accordance with Sub-clause (b) above, or conclusion of such agreement.

(d) The Guarantor's undertaking in Sub-clause (a) above will remain effective notwithstanding that the Charterers' obligations are or become unenforceable for any reason whatsoever.

(e) If the parties to this Guarantee have agreed a maximum liability figure as stated in Box 8 this figure shall be the maximum total liability of the Guarantor, whether one or more Guaranteed Amounts are payable, pursuant to Sub-clause 2(a) above.

3. **Continuing Nature of Guarantee**

(a) This Guarantee shall not be affected by any indulgence or delay allowed to the Charterers nor by any amendment to, or variation of, the Charter Party whether as to time or otherwise that may be agreed between the Owners and the Charterers nor by any circumstances that would otherwise discharge the Guarantor's liability under this guarantee.

(b) The Guarantor's liability under this Guarantee shall not be discharged in whole or in part or otherwise be affected in any way by reason of the bankruptcy, insolvency, liquidation, dissolution, amalgamation, reconstruction or reorganisation of the Charterers or the appointment of a receiver, administrative receiver or administrator of any of the Charterers' assets (or the equivalent of any such matters occurring in any other jurisdiction).

(c) The Guarantor's liability under this Guarantee shall continue until such time as all obligations of the Charterers under the Charter Party have been fully performed subject to the condition that any demand on the Guarantor under the Guarantee shall be made within the number of months stated in Box 9 or, if left blank, twelve (12) months of redelivery of the Vessel to the Owners unless and to the extent that proceedings have been commenced in accordance with Sub-clause 2(b), in which case the Guarantee shall continue for forty-five (45) days from the date of final agreement between the Owners and the Charterers, or the publication of a final unappealable judgment or arbitration award pursuant to the Charter Party.

(d) The Guarantor's liability hereunder is continuing and shall not be discharged or satisfied by any one Demand. For the avoidance of doubt the Owners shall be entitled to make multiple Demands.

4. **No Deduction or withholding**
All sums payable by the Guarantor under this Guarantee shall be paid to such account as the Owners shall specify free and clear of set-off or counterclaim or any other deduction or withholdings whatsoever.

5. **Owners' rights, powers and remedies**
The Owners shall not be obliged before exercising any of the rights, powers or remedies conferred upon them under this Guarantee or by law to:

(a) make any demand of the Charterers;

(b) take any action or obtain judgment in any court against the Charterers;

(c) make or file any claim or proof in a winding-up, liquidation, entering into administration or dissolution of the Charterers; or

(d) enforce or seek to enforce any other security taken in respect of the Charter Party.

This document is a computer generated BIMCO Charter Party Guarantee printed by authority of BIMCO. Any insertion or deletion to the Guarantee must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

73 6. Demands for Payment
74 (a) All Demands under this Guarantee shall be in writing and shall include a statement of the Guaranteed Amount
75 or other amount claimed and to what it relates. Demands shall be sent to the address for the Guarantor stated in
76 Box 3 and may be sent by any effective means including, but not limited to, facsimile, e-mail, registered or recorded
77 mail, or by personal service.

78 (b) Any Demand sent shall be deemed to have been received:

79 (i) if posted, on the seventh (7th) day after posting;

80 (ii) if sent by facsimile or electronically, on the day of transmission; and

81 (iii) if delivered by hand, on the day of delivery.

82 And in each case proof of posting, handing in or transmission shall be sufficient for the purposes of this Clause.

83 7. Costs, charges and expenses
84 The Guarantor agrees that it will reimburse the Owners on demand for all costs, charges and expenses incurred by
85 the Owners in maintaining, exercising or enforcing any of their rights or powers under the Guarantee.

86 8. Modification
87 Neither this Guarantee nor any terms hereof may be amended, waived, discharged or terminated other than by
88 instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination
89 is sought.

90 9. Assignment and Successors
91 The Owners shall be entitled, at their sole discretion, to transfer to any party by way of assignment all their rights
92 under this Guarantee and this right of assignment shall extend also to any assignee or subsequent assignee. The
93 Guarantor may not assign, charge or transfer any of its rights or obligations under this Guarantee without the prior
94 written consent of the Owner.

95 10. Representations and Warranties
96 The Guarantor hereby warrants to the Owners that it has all the corporate powers, and has taken all necessary
97 corporate, administrative or other steps (including registration of the Guarantee, where appropriate), to enable it to
98 execute, deliver and perform this Guarantee, and that this Guarantee constitutes valid and binding obligations of
99 the Guarantor.

100 11. Governing Law and Jurisdiction and Venue
101 (a) The construction, validity and performance of this Guarantee shall be governed by and construed in accordance
102 with the law of the country stated in Box 10. If Box 10 is blank then English law shall apply.

103 (b) The parties irrevocably submit to the exclusive jurisdiction and venue stated in Box 11. If Box 11 is left blank
104 then the exclusive jurisdiction of the English Courts shall apply.

105 **IN WITNESS** whereof the Guarantor has executed and delivered this Guarantee as of the date set forth in Box 1.

106 SIGNED by
107 Authorised Director                                    David Espinosa Guzmán,

108 For and on behalf of the Guarantor

109 SIGNED by
110 Authorised Director                                    Thomas F Cunningham

111 For and on behalf of the Owners

3
This document is a computer generated BIMCO Charter Party Guarantee printed by authority of BIMCO. Any insertion or deletion to the Guarantee must be clearly
visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document
shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this
computer generated document.

# Exhibit C

AMENDMENT No. 1

**To that BIMCO Time Charter Party for Offshore Service**
**Vessels Between Ranger Offshore Mexico and Tradeco Infraestructura**

THIS AMENDMENT No. 1 to that certain BIMCO Time Charter Party for Offshore Service Vessels (this "Amendment") is dated as of June 13, 2014, by and between Ranger Offshore Mexico, S. de R.L. de C.V. ("Owners") and Tradeco Infraestructura, S.A de C.V. ("Charterers"). Owners and Charterers may be hereafter sometimes referred to individually as a "Party" and collectively as the "Parties".

WHEREAS, Owners and Charterers entered into that certain BIMCO Time Charter Party for Offshore Service Vessels in Houston, Texas and dated January 31, 2014 for the vessel MV Lewek Toucan (the "Charter") and the Parties wish to amend the Charter in certain respects as set out below.

NOW THEREFORE, in consideration of the foregoing and of the mutual covenants and agreements hereinafter set forth, the Parties hereby agree as follows:

1. For the convenience of the Charterers, the Charter will be suspended with the effective date of April 14, 2014 as of 11:59 P.M. U.S. Central Time for a period of not more than 85 days, and an option to Owners to continue the suspension for a period necessary to complete the project, voyage or well in progress, such time not to exceed 65 days. During the period of suspension neither Charterers nor Owners shall have any obligation under the Charter to the other Party, other than as stated herein. Charterers consent to Owners temporarily taking possession and control of the MV Lewek Toucan ("Vessel") for the Charter suspension period. All costs incurred in demobilization for the suspension period, storage, or other charges incurred for the benefit of Charterers during suspension period and cost of mobilization after the suspension period will be charged to Charterers. Charterers shall have the right to have a surveyor participate, without charge, in any off hire survey of the Vessel conducted at the conclusion of the suspension period.

2. Charterers acknowledge that USD 5,948,558.15 in charterhire and related ancillary charges are past due and owing to Owners ("Past Due Charges").

3. Charterers agree to pay the Past Due Charges as follows:

   a. Unconditional and unqualified Pagares in a form acceptable to Owners with Charterers and Grupo Tradeco, S.A. De C.V. as co-makers and co-obligors as follows:

      i. Pagare 1 for USD 600,000.00 payable no later than June 30, 2014.
      ii. Pagare 2 for USD 1,189,711.63 payable no later than July 31, 2014.
      iii. Pagare 3 for USD 1,189,711.63 payable no later than August 29, 2014.
      iv. Pagare 4 for USD 989,711.63 payable no later than September 30, 2014.
      v. Pagare 5 for USD 989,711.63 payable no later than October 31, 2014.
      vi. Pagare 6 for USD 989,711.63 payable no later than November 28, 2014.

   b. In this act the Charters gives to Owners the Pagare 1 and Pagare 2 as well, in the understanding that once Charterers or Grupo Tradeco pay Pagare 1, Owners must have the obligation to returned it and Charters will gives the Pagare 3 and the same process will be with the subsequent Pagares.

c. In addition to the unqualified and unconditional Pagares listed above, within 2 weeks from this date, Charterers shall provide written instructions, in a form acceptable to Owners, to its banking institution that holds in trust the funds from Pemex related to the Akal project instructing it to immediately release those funds it holds to Owners directly to satisfy Pagares 3, 4, 5, and 6 in the event the primary co-obligors and co-makers fail to do so when due. The fact that there are no funds in the trust or there are inadequate funds in the trust or that the banking institution fails to pay any or all amounts to Owners will not relieve Charterers and Grupo Tradeco, S.A. De C.V. from their liability on Pagares 3, 4, 5, or 6.

4. After the period of suspension and between August 10 and September 7, Owners will re-deliver the Vessel to Charterers at the Carmen Sea Buoy. Upon the conclusion of the suspension period and upon re-delivery, the Vessel will return to "on hire" status under the Charter for the original remaining full firm period of 48 days plus an additional 85 days firm.

5. Owners shall provide Charterers with 2 weeks' notice of re-delivery of the Vessel.

6. At least 2 weeks before re-delivery of the Vessel, Charterers shall provide to Owners an irrevocable bank letter of credit equal to 30 days' charterhire in a form acceptable to Owners that allows Owners to immediately draw upon in the event of a charterhire payment default.

7. If Charterers default or breach any of the obligations set out above, including payment default on any Pagare, or any of their obligations in the Charter, Owners shall have the immediate right to any or all of the following: suspend performance of the Charter; withdraw the Vessel from the Charter; terminate the Charter; declare Charterers to be in fundamental breach of the Charter; and Owners shall be free to pursue all of its rights and remedies, none of which have been waived by entering into this Amendment, including the right to arbitration of the charter; enforcement of the charter guarantee; enforcement of the Pagares, all in any sequence or combination of remedies; the choosing of any particular right or remedy in any sequence or combination shall not act as a waiver or relinquishment of any other.

No other rates, terms or conditions of the Charter are changed by this Amendment. Other than the Charter, this Amendment, and the Parent Company Charter Guarantee, there are no other agreements, oral or written, related thereto.

IN WITNESS WHEREOF, Owners and Charterers have duly executed this Amendment as of the date below.

AGREED AND ACCEPTED:

**OWNERS**

By: *Thomas F. Cunningham*

Name: *Thomas F Cunningham*

Title: *Exec. V.P*

Date: *13/6/2014*

**CHARTERERS**

By: *Tradeco*

Name: *David Espinosa C.*

Title: *V.P.*

Date: *13/Junio/2014*